# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JEREMY STROHMEYER,

    Plaintiff,

v.

K. BELANGER, *et al.*,

    Defendants.

Case No.: 3:14-cv-00661-RCJ-WGC

**Order**

Re: ECF No. 120

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center (LCC) and Ely State Prison (ESP). Plaintiff filed an original complaint on December 18, 2014, and then sought leave to file an amended complaint. (ECF Nos. 1-1, 7.) District Judge Robert C. Jones granted the motion and screened the amended complaint, dismissing it in its entirety with prejudice. (ECF No. 8.) Plaintiff appealed. (ECF No. 11.) On August 5, 2016, the Ninth Circuit Court of Appeals issued its memorandum decision affirming in part, reversing in part, vacating in part, and remanding Judge Jones' disposition on the amended complaint. (ECF No. 15.) District Judge Jones then gave Plaintiff 30 days to file a second amended complaint (SAC). (ECF No. 19.) He was given several extensions of time to file the SAC. He filed the SAC on February 6, 2017. (ECF No. 33.) On March 27, 2018, District Judge Jones issued an order screening the SAC, permitting some claims to proceed and dismissing others with and without leave to amend. (ECF No. 44.) The case was then stayed while the parties participated in an early mediation conference, which was ultimately

unsuccessful. (ECF Nos. 44, 48.) On January 28, 2019, Plaintiff filed a motion for leave to file a third amended complaint (TAC). (ECF No. 110.) On February 15, 2019, the undersigned granted Plaintiff's motion and stayed the discovery and dispositive motion deadlines. (ECF No. 119.) The TAC is docketed at ECF No. 120, and the court will now screen the TAC under 28 U.S.C. § 1915A.

## II. LEGAL STANDARD

Under 28 U.S.C. § 1915A, "[t]he court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). In conducting this review, the court "shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint-- (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1)-(2).

Dismissal of a complaint for failure to state a claim upon which relief may be granted is provided for in Federal Rule of Civil Procedure 12(b)(6), and 28 U.S.C. § 1915A(b)(1) tracks that language. As such, when reviewing the adequacy of a complaint under these statutes, the court applies the same standard as is applied under Rule 12(b)(6). *See e.g. Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012). Review under Rule 12(b)(6) is essentially a ruling on a question of law. *See Chappel v. Lab. Corp. of America*, 232 F.3d 719, 723 (9th Cir. 2000) (citation omitted).

The court must accept as true the allegations, construe the pleadings in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted). Allegations in pro se complaints are "held to less stringent standards than formal pleadings drafted by lawyers[.]" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotation marks and citation omitted).

A complaint must contain more than a "formulaic recitation of the elements of a cause of action," it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The pleading must contain something more … than … a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id*. (citation and quotation marks omitted). At a minimum, a plaintiff should include "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A dismissal should not be without leave to amend unless it is clear from the face of the complaint that the action is frivolous and could not be amended to state a federal claim, or the district court lacks subject matter jurisdiction over the action. *See Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995); *O'Loughlin v. Doe*, 920 F.2d 614, 616 (9th Cir. 1990).

### III. DISCUSSION

Plaintiff's complaint names the following defendants: Kelly Belanger (LCC Caseworker), David Bequette[1] (LCC Mailroom Officer on February 15, 2013); Michael Bobadilla (Inmate); David Carpenter (LCC Sergeant); Christopher Cartier (LCC Correctional Officer); Dwayne Deal (LCC Assistant Warden/Grievance Coordinator/Offender Management Administrator); S.L. Foster (NDOC Deputy Director); Michelle Gilder (LCC Grievance Coordinator); Donna Jenkins (aka Donna Widmar, aka Lisa Widmar, aka Lisa Jenkins; LCC Correctional Officer); James Keener (LCC Correctional Officer and Investigator); K. Kirkpatrick (Office of Inspector General employee); Robert LeGrand (LCC Warden); Keith Miranda (LCC Correctional

---

[1] Plaintiff later alleges that he believes Bequette is a pseudonym used by defendant Jenkins and others. To the extent Plaintiff is allowed to proceed against Bequette, it is based on the assumption that Bequette is an actual person and not just a pseudonym used by another defendant.

Officer); Valaree Olivas (LCC Lieutenant); Charles Schardin (Acting NDOC Deputy Director); Adam Vallaster (LCC Correctional Officer); Michael Ward (LCC Lieutenant); and John Whiting (LCC Correctional Officer). The TAC also names NDOC[2], Unknown Inspector General (from December 18, 2012 to March 18, 2015); unknown Inspector General; unknown mailroom staff from December 30, 2012 to April 15, 2013. (ECF No. 120 at 1-9.)

**A. Count I**

Plaintiff alleges that on December 18, 2012, inmate Bobadilla assaulted Plaintiff without provocation in the LCC dining hall. Plaintiff contends that unbeknownst to him, Bobadilla had been involved in a fight with another inmate who was injured just two days before. Inmate Breland was sitting next to Plaintiff in the dining hall when Bobadilla attacked Plaintiff, and jumped in to stop the attack, which resulted in a fight between Breland and Bobadilla.

Plaintiff alleges that Jenkins encouraged Bobadilla to attack Plaintiff in retaliation for Plaintiff filing grievances against her and her friends. Plaintiff also claims that Vallaster abandoned his post in the dining room, leaving Plaintiff defenseless, and that Whiting was not watching the dining hall as he should have been. Plaintiff claims that all of these Defendants knew about the prior fight Bobadilla was involved in. Plaintiff further avers that the attack was set up, encouraged, and permitted by Jenkins, Olivas and Keener because they did not like him, and in retaliation for previous grievances filed. (ECF No. 12- at 25-28.) Plaintiff claims that Bobadilla made up a story about Plaintiff stabbing him with a pencil, that Plaintiff contends Bobadilla actually planted in the dining hall. (*Id.* at 27.)

---

[2] The Nevada Department of Corrections has already been dismissed from this action with prejudice, and will remain as such. (*See* ECF No. 44 at 16.)

As with the second amended complaint, Plaintiff states a colorable Eighth Amendment claim for failure to protect based on allegations that Defendants knew of or created a risk to Plaintiff's safety and then failed to protect Plaintiff from that risk. This claim will proceed against Jenkins, Vallaster, Whiting, Olivas and Keener.

Count I also contains allegations concerning Jenkins alleged false report; Ward's alleged destruction of evidence (the pencil); Olivas filing a false notice of charges against him; Keener suppressing or destroying evidence of Plaintiff's innocence; and his placement in solitary confinement for an extended period of time under terrible conditions. (ECF No. 120 at 26-29.) These allegations overlap with other claims asserted below, and will be discussed in connection with those claims.

**B. Count II**

In Count II, Plaintiff alleges that between December 18 and 20, 2012, Jenkins filed a false report against him, via email from her home, that falsely accused Plaintiff of starting the fight and allegedly stabbing Bobadilla with a pencil in order to have him punished for a crime he did not commit. (ECF No. 120 at 26, 30, 32.)

On December 18, 2012, Plaintiff alleges that Ward destroyed fingerprint and possible DNA evidence on the pencil by fondling, twirling and playing with the pencil. (ECF No. 120 at 9-10, 27, 32.)

Then, on December 20, 2012, Olivas filed a falsified notice of charges against Plaintiff for assault and battery to have him wrongfully punished for a crime he did not commit without any meaningful investigation. (ECF No. 120 at 10, 27, 30, 32.)

Plaintiff contends that between December 18, 2012 and March 6, 2013, LCC Investigator Keener suppressed or destroyed evidence of Plaintiff's innocence by withholding or destroying:

photos of Bobadilla's alleged injuries from the previous fight; documents and other evidence of Bobadilla's previous fight; medical records of Bobadilla from both incidents; the pencil; and exculpatory witness statements. (ECF No. 120 at 10, 27, 30.) He similarly alleges that LeGrand withheld and refused to respond to requests for documentary evidence. (*Id.* at 32.)

On March 30, 2013[3], Carpenter violated Plaintiff's rights during the disciplinary hearing because: Plaintiff was not given adequate notice of the hearing; during the hearing Carpenter did not disclose photos and medical records of Bobadilla's alleged injuries; Carpenter did not produce the alleged weapon; Carpenter did not disclose the results of Keener's investigation; Carpenter did not disclose the evidence relied on in the written disposition; Plaintiff was not allowed to defend himself by calling every one of his witnesses; Plaintiff was not allowed to confront Bobadilla; Plaintiff was not allowed to question the charging employee; Carpenter was not an impartial fact finder; Carpenter withheld and refused to respond to requests for documentary and exculpatory evidence; and Plaintiff was convicted on no evidence.

 (ECF No. 120 at 31, 33.)

Plaintiff further alleges that on June 25, 2013, he filed a formal complaint against Jenkins, Keener, and Olivas, which was referred to the Inspector General's Office for review, but the (unidentified) investigator from the Inspector General's Office buried and/or destroyed exculpatory evidence proving his innocence. (ECF No. 120 at 32.)

---

[3] Plaintiff alleged in the original complaint that he had an initial disciplinary hearing with Gentry in 2012, whom he claimed violated his rights during the hearing. (ECF No. 7-1 at 19-20.) LeGrand later overturned that conviction. (*Id.* at 19.) He had a second disciplinary hearing with Carpenter in March of 2013. (*Id.* at 20.) The Ninth Circuit found Judge Jones properly dismissed Plaintiff's claims related to the initial disciplinary hearing by Gentry in 2012 because the determination had been overturned on appeal. *Strohmeyer v. Belanger,* 661 Fed.Appx. 471, 473 (9th Cir. 2016). The Ninth Circuit found that Judge Jones erred in dismissing the due process claim arising from the March 2013 disciplinary hearing. *Id.*

On August 26, 2013, Kirkpatrick, an employee of the Inspector General's Office, received a letter from Plaintiff requesting that Jenkins, Keener, and Olivas be investigated, and Kirkpatrick buried this letter instead of investigating. (ECF No. 120 at 32.)

Plaintiff alleges that he was ultimately sentenced to two years of disciplinary segregation (solitary confinement), which was later reduced on appeal to one year. He served nine months of the one year due to credits for good behavior. (ECF No. 120 at 10.) Even though his sentence was completed on September 24, 2013, he continued to be confined in solitary for over 17 more months, until March 18, 2015. He avers that in this confinement he was subject to punitive loss of privileges and was kept in inhumane conditions. (*Id*.) Prior to this time, he had tier time (time outside his cell to use the phone and socialize); yard time every day; a cellmate; he could walk to the dining hall and eat with others twice a day and get good, healthy food; he had a television, video games, an electric guitar, an amp, a boombox, a CD player, a radio, books, magazines, writing utensils, and art supplies; he could play group sports and exercise in the yard and in the gym; he attended college classes and had a job in his unit; he could purchase items from the canteen and could receive food and clothing packages quarterly; he was not handcuffed or shackled leaving his cell; he could shower as often as he wanted; his phone calls were unrestricted; and he had visitation privileges every week. (*Id*. at 10-12.)

After six months in solitary confinement, he lost more than ten percent of his muscle mass and his weight dropped approximately 18 pounds; he had back pain, intestinal pain, unusual bowel movements, depression, anxiety, sleeplessness, and headaches; almost all of his property was taken; he was kept in a cell by himself almost 24 hours a day, except for a shower every few days; he was not allowed outside recreation; the food was cold and of smaller portions; there was no socialization; he could no longer go to school or the gym; he could not purchase items from the

canteen (including dandruff shampoo which caused scalp issues); he could not receive his quarterly packages; he only got one 30-minute phone call per month; he only had one non-contact visit per month in handcuffs. (*Id*. at 13-14.)

He was transferred to ESP on April 9, 2013, and all movement outside his cell was while shackled at the hands and legs; he had no television (though after a few months he had a CD player with a radio); he had an hour in a small enclosed space without a roof every day or two, but there was no direct sunlight and the temperatures were below zero in the winter; he was strip searched every time he left his cell; he could not purchase food, hobbycraft or receive packages; he could not attend classes or chapel; he could only shower once every three days; and he had no physical access to the law library. (*Id*. at 17.)

On September 25, 2013, he completed his disciplinary segregation at ESP, but remained under those same conditions until October 31, 2013. (*Id*. at 20-21.) He was then placed in administrative segregation at ESP and the conditions were essentially the same as in disciplinary segregation. The only difference was that he could order and receive books again; he could order food from the canteen; he had contact visits (though limited because of ESP's remote location); and, he could have his other appliances. *Id*. at 21.

In the second screening order, District Judge Jones dismissed the due process claims in Count II as *Heck* barred. District Judge Jones relied on the applicability of *Heck* to prison disciplinary hearings resulting in the loss of good time credits, but in the TAC, Plaintiff explicitly alleges that he did not lose any good time credits as a result of the disciplinary sanction. Therefore, the court will address whether Plaintiff may now proceed with his due process claims in Count II.

The Fourteenth Amendment provides: "No state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. A plaintiff asserting a

Fourteenth Amendment due process claim related to disciplinary action that leads to his confinement in disciplinary segregation must first establish that he has been deprived of a protected liberty interest in order to invoke the Due Process Clause's protections. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013). Once the plaintiff has established that one of these interests is at stake, the court's analysis turns to whether the inmate suffered a denial of adequate procedural protections. *See Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003) (citations omitted).

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' ... or it may arise from an expectation or interest created by state laws or policies[.]" *Wilkinson*, 545 U.S. at 221 (citing *Vitek v. Jones*, 445 U.S. 480, 493-94 (1980) (finding a liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution under Due Process Clause itself) and *Wolff v. McDonnell*, 418 U.S. 539, 556-558 (1974) (finding a liberty interest in avoiding withdrawal of state-created system of good-time credits)).

First, under the Constitution itself, a liberty interest is implicated when the conditions of confinement exceed "the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Mitchell v. Dupnik*, 75 F.3d 517, 523 (9th Cir. 1996) (internal quotation marks and citation omitted). The Ninth Circuit has recognized that "only the most extreme changes in the conditions of confinement" such as "involuntary commitment to a mental institution" and "forced administration of psychotropic drugs" have been found to "directly invoke the protections of the Due Process Clause." *Chappell*, 706 F.3d at 1063 (citing *Vitek*, 445 U.S. at 493-94; *Washington v. Harper*, 494 U.S. 210, 221-22 (1990)). Other circumstances where a liberty interest has been found as arising from the Due Process Clause itself include: revocation of probation, *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); revocation of parole status (not just mere

denial of parole), *Morrissey v. Brewer*, 408 U.S. 471 (1972); and labeling an inmate as a sex offender, *Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997).

Plaintiff does not include allegations that courts have recognized directly invoke the protections of the Due Process Clause; therefore, the court will turn to state-created liberty interests. "A state may create a liberty interest through statutes, prison regulations, and policies." *Chappell*, 706 F.3d at 1063 (citing *Wilkinson*, 545 U.S. at 222 and *Neal*, 131 F.3d at 827). This, however, is "'subject to the important limitations set forth in *Sandin v. Conner*[.]" *Wilkinson*, 545 U.S. at 222. *Sandin* rejected the previously employed approach for evaluating whether there was a state-created liberty interest which looked at the mandatory language of prison regulations. *See id.* (citing *Sandin v. Conner,* 515 U.S. 472, 481 (1995)). Instead, *Sandin* directed that it was more important to look at the "nature of the deprivation." *Id.* (citing *Sandin*, 515 U.S. at 481).

"Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472, 485 (1995). Thus, a change in the conditions of confinement, such as Plaintiff's confinement to disciplinary segregation, only rises to the level of a protected liberty interest if it amounts to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to the protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

Placement in punitive segregation alone does not make the conditions of confinement an "atypical and significant hardship." *Sandin*, 515 U.S. at 485; *Chappell*, 706 F.3d at 1063 (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("the Due Process Clause does not protect against all

changes in conditions of confinement even where they 'hav[e] a substantial adverse impact on the prisoner involved.'").

The Supreme Court has declined to establish a "baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223 (noting inconsistent conclusions among the circuits, but concluding that assignment to Ohio's "Supermax" facility satisfied this standard "under any plausible baseline"). The Ninth Circuit has concluded, however, that to determine whether a particular form of restraint imposes "atypical and significant hardship," a court considers a condition or combination of conditions or factors on a case by case basis, rather than invoking a single standard." *Chappell*, 706 F.3d at 1064 (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) (confirming that the inquiry is "context-dependent" and requires "fact by fact consideration"). At least three factors have been used to guide this inquiry: (1) "whether the conditions of confinement mirrored those conditions imposed upon inmates in analogous *discretionary* confinement settings;" (2) "the duration and intensity of the conditions of confinement;" and (3) "Whether the change in confinement would inevitably affect the duration of the [prisoner's] sentence." *Chappell*, 706 F.3d at 1064-65 (italics original) (internal quotation marks and citation omitted). As such, "*Sandin* requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) [or the prisoner's baseline conditions] and disciplinary segregation, examining the hardship caused by the prisoner's challenged action in relation to the basic conditions of life as a prisoner." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003).

In *Wilkinson*, the Supreme Court considered a challenge to Ohio's placement of prisoner's in its "Supermax" facility−a "maximum-security prison with highly restrictive conditions." *Wilkinson*, 545 U.S. at 213. Inmates were required to stay in their seven by fourteen foot cells for

twenty-three hours a day with constant illumination; they could not communicate with other inmates and were deprived of almost all human contact; they were limited to one hour of exercise a day in a small, indoor room; their placement in the facility was indefinite, and after an initial thirty-day review, their placement was reviewed only once a year; and an inmate moved to the facility who was otherwise eligible for parole would become ineligible. *Id.* at 214, 215, 224. The Supreme Court found that while the conditions at the facility taken alone might not create a liberty interest, "taken together they impose an atypical and significant hardship within the correctional context" so as to create a "liberty interest in avoiding assignment" to the facility. *Id.* at 224 (citation omitted).

In *Brown v. Oregon Department of Corrections*, 751 F.3d 983 (9th Cir. 2014), the Ninth Circuit addressed a situation where a prisoner was placed in Oregon's Intensive Management Unit (IMU) for twenty-seven months. Inmates in the IMU were in solitary confinement for twenty-three hours a day. *Id.* at 985. They got out of their cells for forty minutes a day, thirty of which could be spent in recreation. *Id.* Half of that time (fifteen minutes) could be spent in an "outside" facility within a fifteen by forty foot room with high, concrete walls covered by a metal grate. *Id.* This was compared to inmates in general population who got twenty-five to thirty-five hours a week for recreation and social interaction, including two to five hours a day of outdoor recreation. *Id.* Inmates in the IMU got two non-contact visits per month and a maximum of two visitors in a six month period. *Id.* General population inmates got between eleven and twenty-two contact visits per month and an unlimited number of approved visitors. *Id.* IMU inmates were denied access to prison and law libraries, group religious worship, educational and vocational opportunities, telephone usage except in emergencies, access to televisions, and personal property. *Id.*

The Ninth Circuit held that "under any plausible baseline, Brown's twenty-seven month confinement in the IMU without meaningful review 'impose[d] atypical and significant hardships on [him] in relation to the ordinary incidents of prison life.'" *Id.* at 988 (quoting *Sandin*, 515 U.S. at 484).

Plaintiff's allegations of the conditions he was exposed to may not separately give rise to a liberty interest, but when considered together and with the length of time Plaintiff was in disciplinary and administrative segregation, are sufficient on screening to implicate a liberty interest.

With respect to prison disciplinary proceedings, while they "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply," an inmate is still entitled to certain procedural protections. *Wolff v. McDonnell*, 418 U.S. 539, 555-556. When an inmate faces disciplinary charges, due process requires the inmate receive: (1) written notice of charges; (2) at least 24 hours between the time the prisoner receives the notice and the time of the hearing, so he had an opportunity to prepare a defense; (3) a written statement of the evidence relied upon and the reasons for taking the disciplinary action; (4) the right to call witnesses in his defense, if it would not be unduly hazardous to safety or correctional goals; and (5) legal assistance if the prisoner is illiterate or the issues presented are legally complex. *Id.* at 556.

In addition, "the requirements of due process are satisfied if *some evidence* supports the decision by the prison disciplinary board[.]" *Superintendent Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985) (emphasis added).

Due process also requires an unbiased hearing officer. *Edwards v. Balisok*, 520 U.S. 641 (1997); *Wolff*, 418 U.S. at 571.

Finally, if a prisoner receives proper procedural due process, a claim based on the falsity of disciplinary charges, standing alone, does not state a constitutional claim. *See e.g. Freeman v. Rideout*, 808 F.2d 949, 951; *Hanrahan v. Lane*, 747 F.2d 1137, 1140-41 (7th Cir. 1984). The corollary to that is that if an inmate alleges he was subject to false disciplinary charges and did not receive the proper procedural protections, he will generally state a claim for purposes of screening.

The court finds Plaintiff states colorable due process claims in Count II. Plaintiff may proceed on his claims against Jenkins, Ward, Olivas, Keener, LeGrand, and Kirkpatrick based on allegations that they falsified, withheld, suppressed or destroyed evidence because Plaintiff alleges he was not provided with due process protections in connection with his disciplinary hearing. He includes a similar claim against an unidentified investigator, and he may proceed on this claim if the investigator is identified within the parameters of the operative scheduling order for adding parties. Plaintiff may also proceed with his claim that Carpenter violated his due process rights in the disciplinary hearing when he did not provide adequate notice, did not provide written notice of the evidence relied on and reasons for the disciplinary sanction, he was not allowed to call witnesses, Carpenter was not impartial, and the decision was not supported by any evidence.

**C. Count III**

Plaintiff alleges that in 2009, he filed a grievance against Jenkins for unlawful seizure of property. He contends that Jenkins, Belanger, Olivas, Keener, Ward and Vallaster are all friends. On December 20, 2012, Fox served Plaintiff with a notice of charges, and after Plaintiff told Fox that Jenkins had falsified her report, Fox responded: "This is prison. That's what happens." Plaintiff believes that Fox told Jenkins and other guards about Plaintiff's accusations against Jenkins. (ECF No. 120 at 36.)

On December 21, 2012, during an administrative segregation classification hearing before Belanger, Miranda and another officer, Plaintiff asked Belanger to report Jenkins to the Inspector General for falsifying her report. Plaintiff believes that Belanger and Miranda told Jenkins of Plaintiff's complaint about Jenkins, and instead of reporting Plaintiff's complaint, he contends that they conspired with Jenkins to prevent the complaint from getting out of LCC. (*Id*. at 36-37.)

On December 25, 2012, Plaintiff submitted a book request form to obtain the Prison Self-Help Litigation Manual, and it was not returned with approval until February 12, 2013. He claims that the delay in getting the book approval was in retaliation for filing complaints, because his prior book request forms had been returned in less than 14 days. (*Id*. at 37.)

After Plaintiff was placed in solitary confinement on December 18, 2012, mail became his primary source of communication with the outside world. He alleges that up until December 30, 2012, he had sent and received mail from his wife without delay or interference for two years at LCC. Then, starting on December 30, 2012, unknown mail room staff began interfering with the mail, not delivering the mail, delaying the mail, seizing it and wrongfully deeming it unauthorized. In addition, his visits were reduced from contact visits three days a week to one monthly non-contact visit. This continued until April 5, 2013, when he was transferred to ESP. (*Id.*)

He contends that Bequette deemed a letter from Plaintiff's wife unauthorized and refused to deliver it to him because it referred to Jenkins. On February 18, 2013, he claims that Belanger withheld his mail. Then, on February 26, 2013, Olivas responded to his grievance on that issue and further withheld this mail, which Belanger signed off on. Between December 28, 2912 and April 5, 2013, Plaintiff claims that Jenkins, Olivas, Bequette, and an unknown LCC mailroom officer delayed Plaintiff getting letters from his wife. He alleges that this all occurred immediately after his complaints against Jenkins, Olivas, Keener and Belanger. (*Id*. at 38.)

He alleges that he feared further retaliation, so he stopped speaking out against Jenkins and the others while at LCC, and until he was transferred to ESP. (*Id*. at 38-39.)

To state a retaliation claim, a plaintiff must allege that a state actor took adverse action against him because of his protected conduct, and such action chilled the exercise of his First Amendment rights, and did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2004).

Plaintiff states a colorable retaliation claim based on allegations that he never had issues with his book orders, visitation or mail until he reported Jenkins for falsifying her report. This claim will proceed against Jenkins, Belanger, Miranda, Olivas, and Bequette (assuming Plaintiff can identify this as an actual person and not just a pseudonym used by Jenkins). The claim may also proceed against the unidentified mailroom officer when Plaintiff learns the identify, and if he substitutes the defendant in conformity with the operative scheduling order and Federal Rules of Civil Procedure.

**D. Count IV**

In Count IV, Plaintiff alleges First Amendment violations against Jenkins, Bequette, and unidentified mailroom officers for delaying, not delivering and destroying mail from his wife. (ECF No. 120 at 40.)

Generally, prisoners have a First Amendment right to send and receive mail. *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995). Temporary delays of mail do not violate the First Amendment, *see Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999); however, the malicious destruction of mail does.

Plaintiff states a colorable mail tampering claim against Jenkins and Bequette. Plaintiff may also proceed against the unidentified mail room officers when he learns their identities and if

he substitutes them in conformity with the operative scheduling order and Federal Rules of Civil Procedure.

**E. Count V**

Plaintiff alleges that Jenkins, Keener, Ward, Carpenter, Olivas and LeGrand all treated Plaintiff differently than similarly situated inmates during the disciplinary process and his ensuing solitary confinement. He alleges that other inmates charged with assault and battery would have been investigated impartially and referred for criminal prosecution. He alleges that they did not destroy evidence in other inmates' disciplinary actions, or interfere with their ability to receive books, or falsify reports. (ECF No. 120 at 41.) He claims that these things were done to him without any rational relationship to a legitimate state purpose. He points to the case of Andre Breland, who was almost identically situated to Plaintiff in that he was a protective segregation (PS) inmate who was charged with assault and battery arising from the same incident. Breland was also sentenced to two years disciplinary segregation and transferred to ESP; however, Breland was returned to his baseline conditions of confinement after completing his disciplinary segregation time. This is unlike Plaintiff who remained in administrative segregation, and when he was to be transferred back to LCC, this transfer was overridden. (*Id*. at 42.)

The Fourteenth Amendment prohibits the denial of "the equal protection of the laws." U.S. Const. amend. XIV, § 1. It "commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (citation and quotation marks omitted); *Hartmann v. Cal. Dept. of Corr. and Rehab.*, 707 F.3d 1114, 1123 (9th Cir. 2013) (citation omitted).

"To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 2030 (9th Cir. 2013) (citation and quotation marks omitted). Where state action does not implicate a fundamental right or suspect classification, as is the case here, a plaintiff can establish a "'class of one' equal protection claim by demonstrating that [he] 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), *overruled on other grounds by Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008).

"A class of one plaintiff must show that the discriminatory treatment 'was intentionally directed just at him, as opposed … to being an accident or a random act.'" *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001)).

Plaintiff states a colorable equal protection "class of one" claim against Jenkins, Keener, Ward, Carpenter, Olivas and LeGrand based on allegations that they intentionally treated him differently than similarly situated inmates with respect to his disciplinary proceeding.

## F. Count VI

Plaintiff claims that the violation of his rights was part of a conspiracy to protect fellow guards and administrators from being held accountable for their actions, and to chill Plaintiff's rights to grieve the wrongful actions of these employees. He contends that between April 2, 2014, and March 18, 2015, the defendants named above conspired to deprive Plaintiff of his due process rights to meaningful administrative segregation hearings, and his right to be treated the same as

similarly situated inmates, and to keep him in solitary confinement under harsh conditions. (ECF No. 120 at 43.)

To state a claim for conspiracy under section 1983, a Plaintiff must allege an agreement or meeting of the minds to violate constitutional rights and an actual deprivation of those rights resulting from the alleged conspiracy. *See Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002).

Plaintiff states a colorable conspiracy claim against Jenkins, Vallaster, Whiting, Olivas, Keener, Carpenter, Ward, LeGrand, Belanger, Miranda and Bequette.

**G. Count VII**

Plaintiff alleges that after he completed his disciplinary segregation time at ESP on September 25, 2013, he started requesting to be transferred back to LCC in PS. On March 26, 2014, he was approved for transfer back to LCC PS by the full classification committee (FCC) at ESP, and then was approved to transfer by the Offender Management Division (OMD), unbeknownst to Deal. On April 3, 2014, the day he was supposed to be transferred and after he had packed his property, he alleges that Olivas "scratched" him from the LCC transfer list, without a hearing or explanation. He heard from other guards that someone at LCC must not like him or that he was writing too many grievances. He claims he should have been transferred back to LCC as soon as his disciplinary segregation time was completed. This resulted in him being kept in administrative segregation without any meaningful review for over 16 months. He alleges that Breland completed his disciplinary segregation for the same offense and he was transferred back to LCC. He claims the only difference between Plaintiff and Breland was that Breland had not filed a complaint against Jenkins, Keener, and Olivas.

District Judge Jones already ruled that Plaintiff did not state a colorable claim based on the fact that he was not ultimately transferred back to LCC because he does not have a right to be

incarcerated at any particular prison facility. (ECF No. 44 at 12.) Therefore, the TAC will not proceed on that claim. Insofar as Plaintiff asserts that Olivas' action was retaliatory, that will be addressed in Count VIII.

**H. Count VIII**

Plaintiff alleges that Olivas, Deal, and LeGrand treated Plaintiff differently than other LCC PS inmates convicted of assault and battery without a legitimate rational reason. He alleges that Olivas was in charge of incoming transfers when Plaintiff was on the list for transfer back to LCC PS, and when she saw his name on the list, she contacted Deal at OMD to have Plaintiff removed from the list and kept at ESP. Deal did what she asked.

Combined with the allegations of Count VII and the background allegations that when Plaintiff was taken off the list because he filed too many grievances, Plaintiff states a retaliation claim against Olivas and Deal in Count VIII. He does not detail any involvement of LeGrand in this alleged retaliation; therefore, this claim will not proceed against LeGrand.

**I. Count IX**

Plaintiff alleges that Defendants blocked his transfer back to LCC PS for the purpose of keeping him subjected to the harsh living conditions at ESP, with almost no rights, freedoms or privileges compared to LCC PS inmates. He was locked in a cell 23 hours, seven days a week; he had one 15-minute call per week; he could not attend religious or educational programs; his visitation rights were greatly reduced; he did not get packages; he was strip-searched, cuffed and shackled any time he left his cell. This is in comparison to LCC PS where he was able to be out all day, every day; he had unlimited phone calls; he had communal eating arrangements; he could attend education classes and religious services; he was not cuffed and shackled when he left his

cell; he had hours of group yard time every day; he had group gym time multiple times a week; and he had contact visitation every weekend.

Insofar as Plaintiff claims he was retaliated against for his complaints, these allegations may be incorporated with those in Counts VII and VIII.

Based on the caselaw set forth above, and the fact that Plaintiff alleges he did not receive any meaningful reviews of his administrative segregation status, Plaintiff is permitted to proceed with a due process claim in Count IX. Liberally interpreting the allegations, the court will allow Plaintiff to proceed against Olivas and Deal, who were implicated in the prior counts as being responsible for Plaintiff being kept at ESP. *See Hewitt v. Helms*, 459 U.S. 460, 477 n. 9 (1983), *abrogated in part on other grounds in Sandin*, 515 U.S. 472.

## J. Count X

Plaintiff alleges that Olivas, LeGrand, and Deal conspired to prevent Plaintiff from being transferred to LCC PS.

Plaintiff had no right to be housed at a particular NDOC facility; however, to the extent Plaintiff alleges that defendants conspired to retaliate against him, Plaintiff may proceed with his claim in Count X. Since there are no allegations concerning LeGrand's involvement in this conspiracy to retaliate against Plaintiff, the claim will only proceed against Olivas and Deal.

## K. Count XI

Plaintiff alleges that on March 10, 2013, Carpenter found Plaintiff guilty of assault and battery as and sentenced Plaintiff to 24 months in disciplinary segregation. Plaintiff claims that under Nevada Law, he has a right to counsel at any disciplinary hearing where the charge would constitute a felony in criminal court. He alleges that Carpenter did not inform him of his right to counsel or ask if wanted attorney. (ECF No. 120 at 50.)

In *Wolff,* the Supreme Court stated that it was "not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings." *Wolff*, 418 U.S. at 570. If an inmate is illiterate or where "the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of his case," the inmate "should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." *Id*.

Here, Plaintiff has not alleged that he is illiterate or that the issues involved in his disciplinary proceeding were so complex that he was entitled to assistance. In fact, his allegations demonstrate he had a very good understanding of the issues involved in the disciplinary proceeding.

Moreover, the Ninth Circuit previously acknowledged that Plaintiff did not state a federal right to counsel claim. *See Strohmeyer v. Belanger*, 661 Fed.Appx.471, 473 (9th Cir. 2016) (citing *Vitek v. Jones*, 445 U.S. 480, 495-96). Therefore, the TAC will not proceed on Count XI.

**L. Count XII**

Plaintiff alleges that on December 19, 2012, Cartier went through his property, read it and seized an unknown number of legal documents, and Belanger, LeGrand and Schardin or Gilder denied his grievances on this issue.

The Ninth Circuit already affirmed Judge Jones' dismissal of Plaintiff's claims for the unlawful deprivation of his property because he had an adequate post-deprivation remedy under Nevada law. *See Strohmeyer v. Belanger*, 661 Fed.Appx. 471, 473 (9th Cir. 2016). Therefore, this claim will not proceed in the TAC.

## M. Count XIII

Plaintiff alleges that he requested a polygraph in his second level disciplinary appeal on April 19, 2013, and it was ignored by Gilder or Foster. He sent another written request for a polygraph to Kirkpatrick on August 26, 2013. He claims this violated his rights under Nevada Revised Statute (NRS) 289.070. (ECF No. 120 at 52.)

NRS 289.070 pertains to the use of a polygraph examination during an investigation conducted under NRS 289.057. NRS 289.057, in turn, pertains to investigations of peace officers. While Plaintiff may have alleged misconduct by prison personnel, his disciplinary proceeding was not an investigation of a peace officer under these statutes. Judge Jones previously dismissed this claim in the second screening order on the same basis. (ECF No. 44 at 14.) Therefore, Count XIII will not proceed in the TAC.

## N. Count XIV

In Count XIV, Plaintiff alleges that various employees committed illegal acts for purpose of intentionally inflicting emotional distress on Plaintiff. He states that he suffered from upset bowels, hypertension, headaches, back pain and heartburn, painful rash, heightened cortisol. (ECF No. 120 at 53.)

To state a claim for intentional infliction of emotional distress in Nevada, a plaintiff must demonstrate: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Star v. Rabello*, 97 Nev. 124, 125, 625 P.2d 90, 91-92 (1981) (citations omitted).

Judge Jones dismissed this claim in the second screening order on the SAC with leave to amend, finding that Plaintiff had not alleged any objective manifestation of physical injury or illness resulting from emotional distress. (ECF No. 44 at 14.)

Plaintiff now alleges objective manifestation of physical injury from the emotional distress. Therefore, Plaintiff is permitted to proceed with Count XIV against Jenkins, Vallaster, Whiting, Olivas, Keener, Ward, LeGrand, Kirkpatrick, Carpenter, Belanger, Miranda, Olivas, Bequette, and Deal.

**O. Count XV**

Plaintiff alleges that on December 18, 2012, Bobadilla committed the tort of assault and battery on Plaintiff. (ECF No. 120 at 54.)

District Judge Jones allowed Plaintiff to proceed with the assault and battery tort claims against Bobadilla in the second screening order; therefore, Plaintiff is permitted to proceed with those claims in the TAC.

**P. Concluding Remarks**

This case was originally filed in 2014; was amended and screened by District Judge Jones; went to the Ninth Circuit; was amended again with the SAC, which was also screened by Judge Jones; was amended once again with the TAC, which has now been screened by the undersigned Magistrate Judge. Absent a showing of good cause which demonstrates some extraordinary circumstances, any future motions for leave to amend will not be well received (except to substitute in doe defendants within the parameters of the operative scheduling order and rules of civil procedure). It is time for this case to proceed forward.

///

///

# IV. CONCLUSION

(1) The TAC (ECF No. 120) is the operative complaint and will proceed as follows:

 (a) Count I - Eighth Amendment failure to protect claim against Jenkins, Vallaster, Whiting, Olivas and Keener;

 (b) Count II - due process claims against Jenkins, Ward, Olivas, Keener, LeGrand, Kirkpatrick, Carpenter, and the unidentified investigator from the Inspector General's Office (who must be substituted within the parameters of the operative scheduling order and Federal Rules of Civil Procedure);

 (c) Count III - retaliation claim against Jenkins, Belanger, Miranda, Olivas, Bequette (assuming this is an actual person and not just a pseudonym used by another defendant), and the unidentified mailroom officer(s) (who must be substituted within the parameters of the operative scheduling order and Federal Rules of Civil Procedure);

 (d) Count IV - First Amendment mail tampering claim against J unidentified mailroom officer(s) (who must be substituted within the parameters of the operative scheduling order and Federal Rules of Civil Procedure);

 (e) Count V - a "class of one" equal protection claim against Jenkins, Keener, Ward, Carpenter, Olivas and LeGrand;

 (f) Count VI - a conspiracy claim against Jenkins, Vallaster, Whiting, Olivas, Keener, Carpenter, Ward, LeGrand, Belanger, Miranda, and Bequette;

 (g) Count VIII - a retaliation claim against Olivas and Deal;

 (h) Count IX - a due process claim against Olivas and Deal;

 (i) Count X - a conspiracy to retaliate claim against Olivas and Deal;

(j) Count XIV - an intentional infliction of emotional distress claim against Jenkins, Vallaster, Whiting, Olivas, Keener, Ward, LeGrand, Kirkpatrick; Carpenter; Belanger; Miranda, Olivas, Bequette, and Deal;

(k) Count XV - the assault and batter tort claims against Bobadilla

(2) The TAC will NOT proceed on the following claims or as to the following parties which were already dismissed with prejudice from this action:

(a) Count VII - the due process claim based on the failure to transfer Plaintiff back to LCC;

(b) Count XI - the claim for right to counsel in the disciplinary hearing;

(c) Count XII - the deprivation of property claim;

(d) Count XIII - the claim that his requests for a polygraph examination were denied under State law;

(e) NDOC or its Inspector General's Office.

To reiterate, Plaintiff does not state claims in the TAC against Cartier, Foster, Gilder, Schardin, NDOC, or Inspector General's Office.

(3) Within 14 days of the date of this Order, the Attorney General's Office shall file a notice advising the court and Plaintiff of the names of the defendants for whom it does not accept service. For the defendants for whom the Attorney General's Office does not accept service, the Attorney General's Office shall also file under seal, but not serve Plaintiff, the last known addresses of those defendants. If the last known address is a post office box, the Attorney General's Office shall attempt to obtain and provide the last known physical address. The court will issue summonses for those defendants for whom the Attorney General's Office cannot accept service and for which a last known address is filed under seal.

(4) For those defendants whom the Attorney General is already representing service, those defendants must file and serve an answer or other response to the TAC within 30 days of the date of this Order.

(5) The court will address the stay of deadlines and scheduling order as well as Plaintiff's requests to serve defendants named in prior iterations of the complaint by publication at the status conference set for August 14, 2019.

Dated: July 2, 2019.

William G. Cobb
United States Magistrate Judge