# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JEREMY STROHMEYER,

　　　　Plaintiff

v.

K. BELANGER, et. al.,

　　　　Defendants

Case No.: 3:14-cv-00661-RCJ-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 337, 343, 355

　　　　This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

　　　　Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 337, 337-1 to 337-28, 339-1.) Defendant Bobadilla filed a joinder to the motion. (ECF No. 349.) Plaintiff filed a response. (ECF No. 354.) Defendants filed a reply. (ECF No. 361.)

　　　　Also before the court is Plaintiff's Motion for Partial Summary Judgment. (ECF No. 343.) Defendants filed an opposition. (ECF No. 353.) Plaintiff filed a reply. (ECF No. 359.)

　　　　When Plaintiff filed his response to Defendants' motion for summary judgment, he titled it as a response as well as a cross-motion for summary judgment, and it was docketed as both a response (ECF No. 354), and cross-motion (ECF No. 355). On May 26, 2020, the court extended the dispositive motions deadline in this action to June 30, 2020. (ECF No. 324.) Defendants timely filed their motion for summary judgment (ECF No. 337), and Plaintiff timely filed his

motion for partial summary judgment (ECF No. 343).[1] Plaintiff's response to Defendants' motion/cross-motion were filed on July 23, 2020. (EF Nos. 354/355.) Thus, the cross-motion was filed well beyond the June 30, 2020 dispositive motions deadline, and Plaintiff did not seek leave to belatedly file his cross-motion. Therefore, Plaintiff's cross-motion for summary judgment (ECF No. 355) should be stricken as untimely.

After a thorough review, it is further recommended that Defendants' motion for summary judgment[2] be granted, and Plaintiff's motion for partial summary judgment be denied.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Third Amended Complaint (TAC), ECF No. 120.) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center (LCC) and Ely State Prison (ESP). (*Id.*)

On January 28, 2019, Plaintiff filed a motion for leave to file the TAC. (ECF No. 110.) The court granted the motion (ECF No. 119), and on July 2, 2019, issued an order screening the TAC. (ECF No. 153.) Defendants are: Kelly Belanger, David Bequette, former NDOC inmate Michael Bobadilla, David Carpenter, Dwayne Deal, Michelle Gilder, Donna Jenkins, James Keener, Robert LeGrand, Keith Miranda, Valaree Olivas, Charles Schardin, Adam Vallaster, Michael Ward, and John Whiting. The State of Nevada on relation of NDOC is also a defendant for the state law claim in Count XII only. Defendant Koree Kirkpatrick was dismissed without

---

[1] While Plaintiff's motion for partial summary judgment was docketed on July 2, 2020, the court assumes it was timely under the mailbox rule as it is signed by Plaintiff on June 30, 2020. (ECF No. 343 at 32.)

[2] Defendants did not move for summary judgment as to the State law property claims in Count XII, or the State law assault and battery tort claims against Bobadilla, though Plaintiff does move for partial summary judgment as to the tort claims against Bobadilla. The court recommends that the District Judge decline to exercise supplemental jurisdiction over those remaining claims.

prejudice for lack of service under Federal Rule of Civil procedure 4(m). (ECF No. 369.) Plaintiff also named several doe defendants (unidentified mailroom staff in Count III and an unidentified mailroom officer in Count IV), who were never identified and substituted in as defendants; therefore, they should be dismissed.

Plaintiff was allowed to proceed with claims under the Eighth Amendment (failure to protect), the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, the First Amendment (retaliation and mail tampering), as well as a conspiracy claim, and State law deprivation of property, intentional infliction of emotional distress (IIED), and assault and battery tort claims. (*See* ECF Nos. 153, 173, 186.)

Generally, Plaintiff's claims stem from an altercation that occurred between him and inmate defendant Bobadilla[3] in LCC's dining hall on December 18, 2012. Plaintiff claims that certain defendants instigated the fight, and that others abandoned their posts and did not act to prevent the attack. Plaintiff was charged with assault and battery in a prison disciplinary proceeding. He claims that defendant Jenkins falsified evidence leading to the charges, Ward destroyed fingerprint and possible DNA evidence from the pencil that Plaintiff was accused of using to stab Bobadilla with, and defendant Olivas falsified the notice of charges. He further alleges that Keener suppressed, withheld or destroyed evidence in connection with his investigation, and that LeGrand refused to respond to his requests for documentary evidence.

Plaintiff had a hearing where he was found guilty and sentenced to 24 months in disciplinary segregation. He appealed the disciplinary determination, and a re-hearing was ordered. Plaintiff appeared at another hearing before disciplinary hearing officer Carpenter, and he was once again found guilty and sentenced to 24 months in disciplinary segregation. Plaintiff

---

[3] Bobadilla was subsequently released from prison.

1    began his disciplinary segregation term at LCC, but was subsequently transferred to ESP to serve

2    out the remainder, and then remained in administrative segregation at ESP until he was

3    eventually transferred to High Desert State Prison (HDSP), even though he alleges he was

4    previously approved to transfer back to LCC.

5        Plaintiff claims that Carpenter violated his due process rights in connection with the

6    hearing because he was not provided adequate notice of the hearing, he was not allowed to call

7    all of his witnesses, Carpenter did not disclose exculpatory documentary evidence or the results

8    of Keener's investigation, Carpenter was not impartial, and Carpenter's decision was not

9    supported by any evidence. Plaintiff also asserts a "class of one" equal protection claim based on

10   allegations that he was treated different than other similarly situated inmates with respect to his

11   disciplinary proceeding.

12       Plaintiff further avers that many of the Defendants retaliated against him for reporting

13   Jenkins by delaying his book approval requests, and interfering with his visitation and mail, and

14   that his First Amendment rights were violated when his mail was tampered with.

15       Plaintiff claims that Defendants conspired to violate his rights. He further avers that

16   Olivas and Deal conspired to retaliate against him by removing him from the list to be

17   transferred from ESP back to LCC. He claims that they also denied his due process right to

18   meaningful reviews of his administrative segregation status.

19       Finally, Plaintiff asserts State law claims for the deprivation of property and IIED against

20   various Defendants, as well as assault and battery tort claims against Bobadilla.

21       Defendants move for summary judgment as to all claims except their motion does not

22   mention the state law deprivation of property claim in Count XII, or the assault and battery

23   claims against Bobadilla in Count XV.

Plaintiff moves for partial summary judgment as to the Eighth Amendment failure to protect claim in Count I, the due process claims in Count II, and his State law assault and battery claims against Bobadilla in Count XV.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

1 nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

2 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

3 determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

4 *Anderson*, 477 U.S. at 249.

5        In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

6 "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

7 come forward with evidence which would entitle it to a directed verdict if the evidence went

8 uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

9 the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

10 *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

11 omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

12 defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

13 an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

14 party cannot establish an element essential to that party's case on which that party will have the

15 burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

16        If the moving party satisfies its initial burden, the burden shifts to the opposing party to

17 establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

18 *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

19 dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

20 be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

21 *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

22 (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

23 by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Count I - Eighth Amendment Failure to Protect vs Jenkins, Vallaster, Whiting, Olivas, and Keener**

**1. Allegations**

Plaintiff alleges that on December 18, 2012, Bobadilla assaulted him without provocation

in the LCC dining hall. He asserts that two days prior, Bobadilla had been in a fight with a

different inmate and received numerous injuries. Plaintiff alleges that the Defendants all knew

about Bobadilla's earlier fight and that Bobadilla suffered injuries that were still fresh. Plaintiff

claims that Jenkins encouraged Bobadilla to attack Plaintiff in retaliation for Plaintiff filing

grievances against Jenkins and her friends. Plaintiff avers that Vallaster abandoned his post in

the dining room, leaving Plaintiff defenseless. In addition, he asserts that Whiting was not

watching the dining hall as he should have been, and so he did not witness the attack or act to

help when it began. Plaintiff claims the attack was a set-up, encouraged and permitted by

Jenkins, Olivas, and Keener, because they did not like him and in retaliation for previously filed

grievances.

**2. Legal Standard**

Under the Eighth Amendment, prison conditions should not "involve the wanton and

unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the

crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although

prison conditions may be, and often are, restrictive and harsh, "prison officials must ensure that

inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates[.]'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984); other citations omitted).

"[P]rison officials have a duty...to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citations and quotations omitted); *see also Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir.2015) (citing *Farmer*, 511 U.S. at 833). "Having incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, … having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833  (internal citations and quotation marks omitted). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id*. at 834 (quoting *Rhodes*, 452 U.S. at 347).

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834; *see also Labatad v. Corrections Corp. of America*, 714F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met.  *See Farmer*, 511 U.S. at 834; *Labatad*, 714F.3d at 1160.

 "First, the deprivation alleged must be, objectively, sufficiently serious ... ; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities[.]'" *Farmer*, 511 U.S. at 834 (citations and quotation marks omitted).  When a plaintiff claims prison officials failed to take reasonable steps to protect, the plaintiff must show

that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citation omitted).

Second, the inmate must satisfy the subjective element. This means that the prison official must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). "Liability may only follow if a prison official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Labatad*, 714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847).

**3. Analysis**

Defendants have presented evidence that they did not know of or disregard a risk to Plaintiff's safety in connection with the altercation that took place with Bobadilla on December 18, 2012. In his response to their motion, Plaintiff does not raise a genuine dispute of material fact as to Defendants' alleged deliberate indifference. Nor does he demonstrate the absence of a genuine dispute of material fact in his own motion.

Jenkins' declaration states she did not encourage or permit the confrontation between Plaintiff and Bobadilla, and she had no contact with Bobadilla prior to the incident. (Jenkins Decl., ECF No. 337-2.)

Plaintiff argues that Jenkins was not paying attention because "she had greater things to deal with." Plaintiff takes this statement from Jenkins' testimony at his disciplinary hearing out of context. Jenkins was testifying about what she observed when the incident occurred, and Plaintiff asked Jenkins how long it was from the time Plaintiff landed his first blow on Bobadilla to when

1    everyone was on the ground. (ECF No. 343-16 at 33, p. 33:17-20.)[4] It was clarified that he was

2    asking about the time from when she witnessed the first strike. (*Id*. at 33:21-25, 34:1.) Jenkins

3    responded: "Not a clue. I wasn't paying attention at the time. I have much greater things to deal

4    with." (*Id*. at 34:3-5.) When read in context with her testimony, it is clear that her statement was

5    not that she was not paying attention to the event as a whole, but that she was not paying

6    attention to the amount of time that passed between when the first punch was thrown by Plaintiff

7    until the inmates were all on the ground. This does not demonstrate that Jenkins knew of and

8    disregarded a risk to Plaintiff's safety. Plaintiff's claim that Jenkins' instigated or somehow was

9    the mastermind behind the altercation is based purely on speculation.

10        Vallaster states he was on duty outside the dining hall when the incident occurred. He

11    also maintains he did not encourage or permit the confrontation, and did not have any contact

12    with Bobadilla prior to the incident. Vallaster did not "flee" the dining hall or abandon his post as

13    Plaintiff alleges, but instead when he was made aware of the disturbance, he responded and

14    provided assistance to the other officers. (Vallaster Decl., ECF No. 337-5.)

15        Plaintiff argues that Vallaster was not at his assigned post and that Vallster did not arrive

16    until after Plaintiff's cellmate Breland had grabbed Bobadilla and subdued him. Plaintiff points to

17    Jenkins' report to support his position; however, Jenkins' report actually says that Jenkins

18    grabbed Breland off of Bobadilla, and at that point Vallster was there and assisted in placing the

19    inmates into restraints. Plaintiff presents no evidence that Vallaster knew of and disregarded a

20    risk to Plaintiff's safety. Instead, the evidence suggests that Vallaster responded appropriately

21    when made aware of the disturbance.

22

23

---

[4] Citations to the transcript of the disciplinary hearing will first note the page in the docket where the referenced testimony can be located, followed by the page and line numbers of the transcript.

Whiting was working in the dining hall gun post. He asserts that he did not encourage or permit the confrontation and did not have contact with Bobadilla prior to the incident. He did not flee or abandon his post, but he was posted inside the gun port when the altercation broke out, and when he observed the disturbance, it was already in progress. It lasted about 20 seconds and was broken up by other officers. (Whiting Decl., ECF No. 337-6.)

Plaintiff argues that Whiting was supposed to be at the gun post overseeing the dining hall, but abandoned his post. Plaintiff has no evidence to support this assertion. Whiting's own declaration directly refutes this position, as does Whiting's report following the incident, on which Plaintiff relies. In his report, Whiting stated that he was posted at the gun post during the dinner feeding on December 18, 2012. Sometime between 5:00 and 5:15 p.m., he observed two inmates fighting in the dining hall toward the front left side. He turned around to get his shotgun out of the gun rack and shouted at Officer Ortiz that there was a fight. Whiting came back to the window of the dining hall and shouted to everyone to get on the ground. He proceeded to rack the first round, which was the "popper" round. He then pointed it out the window toward the ceiling and squeezed the trigger. He realized he forgot to take the safety off, and reached down to click it off and pointed the shotgun back out to the dining hall. By that time, everyone was on the ground, including the two inmates involved in the fight. The dining hall officers had them in restraints and the situation seemed under control. (ECF No. 343 at 42.)

There is no evidence that Whiting knew of and disregarded a risk to Plaintiff's safety. Instead, the evidence reflects that when Whiting noticed the altercation, it was already in progress, and while he was taking steps to intervene, the incident was brought under control by other officers.

Olivas also maintains she did not encourage or permit a confrontation between Plaintiff and Bobadilla; she did not have contact with Bobadilla prior to the incident; she was not assigned to the dining hall at the time of the attack; and she never knew of a risk to Plaintiff's health or safety. (Olivas Decl., ECF No. 337-4.) Keener likewise states that he did not conspire with any person to set up an attack on Plaintiff. (Keener Decl., ECF No. 337-3.)

Plaintiff's argument appears to be that Keener, and possibly Olivas, knew that Bobadilla had been involved in another altercation just two days prior, but Bobadilla was not placed into administrative segregation. He relies on a "Segregation Informative" dated December 18, 2012, that states Plaintiff was involved in a physical altercation in the dining hall, and it appeared he initiated the fight by trying to strike Bobadilla with a pencil as Bobadilla walked by doing his porter duties. The document states: "It should be noted inmate Bobadilla was suspected of being in a physical altercation in unit 3A on Sunday the 16th of December. He was seen in medical as a result of the snitch kite received and had some injuries consistent with a physical altercation. The situation is still being looked into." (ECF No. 343-13 at 14.) It is unclear who signed the form however, it was clearly completed after the December 18, 2012 incident between Plaintiff and Bobadilla.

Even accepting as true that Bobadilla was engaged in a physical altercation two days prior, there is no evidence that Keener or Olivas, or any of the other Defendants named in this claim, knew about that altercation before the December 18, 2012 incident. Defendants provide evidence that there was no offense in custody report or investigation report for the alleged prior altercation. (Deal Decl., ECF No. 337-21 at 3 ¶ 11.) Plaintiff asserts that Keener was the investigator at LCC when the prior altercation took place; however, he provides no evidence that Keener was actually involved in an investigation of this alleged prior incident. Plaintiff also

points to one of Keener's responses to a request for admission, but in that response Keener merely admits that as an investigator at LCC he had regular contact with employees in the Inspector General's Office in 2012 and 2013. (ECF No. 343-11 at 29, response to request for admission 3.) This is not evidence that Keener was involved in this investigation.

Plaintiff also asserts that Olivas was shift supervisor that week; however, even if Olivas was the shift supervisor, and even if she was the shift supervisor who signed the "segregation informative" document on December 18, 2012, this does not demonstrate that Olivas knew about the alleged prior altercation involving Bobadilla *before* the altercation between Plaintiff and Bobadilla on the 18th.

For these reasons, it is recommended that Defendants' motion for summary judgment be granted as to the Eighth Amendment claim in Count I, and that Plaintiff's motion for partial summary judgment be denied as to this claim.

**B. Count II- Due Process vs Jenkins, Ward, Olivas, Keener, LeGrand, Carpenter**

Defendants move for summary judgment as to Count II. Plaintiff opposes Defendants' motion, but also seeks summary judgment in Count II, but only as to Defendants Jenkins, Olivas, Keener, LeGrand, and Carpenter (so he does not move for summary judgment on Count III as to Ward).

**1. Legal Standard**

The Fourteenth Amendment provides that no State "shall ... deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. To invoke its protections, an inmate "must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Once the plaintiff has established one of these interests is at stake, the court's analysis turns to whether the inmate suffered a denial of adequate procedural protections.

1   *See Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003) (citations omitted); *Wilkinson*, 545 U.S.

2   at 221.

3          "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit

4   in the word 'liberty'[.]" *Wilkinson*, 545 U.S. at 221 (citing *Vitek v. Jones*, 445 U.S. 480, 493-94

5   (1980) (liberty interest in avoiding involuntary psychiatric treatment and transfer to mental

6   institution)). "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer

7   to more adverse conditions of confinement." *Id*. (citing *Meachum v. Fano*, 427 U.S. 215, 225

8   (1976) ("[c]onfinement in any of the State's institutions is within the normal limits or range of

9   custody which the conviction has authorized the State to impose"); *see also Chappell v.*

10  *Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013) (quoting *Montayne v. Haymes*, 427 U.S. 236,

11  242 (1976)) ("'As long as the conditions or degree of confinement to which the prisoner is

12  subjected is within the sentence imposed upon him and is not otherwise violative of the

13  Constitution, the Due Process Clause does not itself subject an inmate's treatment by prison

14  authorities to judicial oversight.'").

15         "A state may create a liberty interest through statutes, prison regulations, and policies."

16  *Chappell*, 706 F.3d at 1063 (citing *Wilkinson*, 545 U.S. at 222 and *Neal*, 131 F.3d at 827).

17  *Sandin v. Conner* rejected the previously employed approach for evaluating whether there was a

18  state-created liberty interest which looked at the mandatory language of prison regulations. *See*

19  *id*. (citing *Sandin v. Conner,* 515 U.S. 472, 481 (1995)). Instead, *Sandin* directed that it was more

20  important to look at the "nature of the deprivation." *Id*. (citing *Sandin*, 515 U.S. at 481).

21         "[A] liberty interest in avoiding particular conditions of confinement *may* arise from state

22  policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*, 515

23  U.S. 472 (1995)." *Wilkinson,* 545 U.S. at 222 (emphasis added). *Sandin* held that liberty interests

14

created by the state are generally limited to "freedom from restraints which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84.

"Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485. Thus, a change in conditions of confinement, such as Plaintiff's confinement to disciplinary segregation only rises to the level of a protected liberty interest if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484. Punitive segregation alone does not make the conditions of confinement an "atypical and significant hardship." *Id*. at 485*; Chappell*, 706 F.3d at 1063 (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976)).

The Supreme Court has declined to establish a "baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223 (citations omitted). Instead, the court "considers a condition or combination of conditions or factors on a case by case basis, rather than invoking a single standard." *Chappell*, 706 F.3d at 1064 (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)). At least three factors have been used to guide this inquiry: (1) "whether the conditions of confinement mirrored those conditions imposed upon inmates in analogous *discretionary* confinement settings;" (2) "the duration and intensity of the conditions of confinement;" and (3) "whether the change in confinement would inevitably affect the duration of the [inmate's] sentence." *Chappell*, 706 F.3d at 1064-65 (italics original) (internal quotation mars and citation omitted). "As such, "*Sandin* requires a factual comparison between conditions in general population or administrative segregation (whichever is

1  applicable) and disciplinary segregation, examining the hardship caused by the prisoner's

2  challenged action in relation to the basic conditions of life as a prisoner." *Jackson v. Carey*, 353

3  F.3d 750, 755 (9th Cir. 2003).

4        Assuming a protected liberty interest is established, the court must then determine if the

5  inmate was given due process.

6        "Prison disciplinary proceedings are not part of a criminal prosecution, and the full

7  panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418

8  U.S. 539, 556 (1974) (citation omitted). In other words, while "a prisoner is not wholly stripped

9  of constitutional protections when he is imprisoned for crime," *id*. at 555, his interest in due

10  process "must be accommodated in the distinctive setting of a prison" in order to "[assure] the

11  safety of inmates and prisoners, [avoid] burdensome administrative requirements that might be

12  susceptible to manipulation, and [preserve] the disciplinary process as a means of rehabilitation."

13  *Superintendent, Mass. Corr. Inst., Wapole v. Hill*, 472 U.S. 445, 454-55 (1984) (citations

14  omitted).

15        When an inmate faces disciplinary charges, due process requires that the inmate receive:

16  (1) written notice of charges and at least 24 hours between the time the inmate receives the

17  notice of charges and the time of the hearing so he may prepare his defense; (2) a written

18  statement by the hearing officer of the evidence relied upon and reasons for taking disciplinary

19  action; (3) the right to call witnesses and present documentary evidence in his defense, when

20  doing so would not be unduly hazardous to the institutional safety or correctional goals; and

21  (4) legal assistance if the prisoner is illiterate or the issues presented are legally complex. *Wolff*,

22  418 U.S. at 563-570.

23

An inmate is also entitled to an impartial hearing officer. *See e.g. Wolff*, 418 U.S. at 571; *Edwards v. Balisok*, 520 U.S. 641 (1997).

Finally, to satisfy the requirements of due process, the disciplinary hearing officer's determination must be supported by "some evidence." *Hill*, 472 U.S. at 455.

**2. Liberty Interest**

Preliminarily, Plaintiff's argument concerns both his placement in disciplinary segregation and his subsequent stay in administrative segregation; however, he has a separate claim about due process associated with his placement in administrative segregation, which will be discussed below.

The record reflects that Plaintiff was placed in administrative segregation after he was charged with assault and battery on December 21, 2012. (ECF No. 337-8 at 8.) Plaintiff had his first disciplinary hearing on December 24, 2012, and was sanctioned to 24 months in disciplinary segregation. (*Id.*) Plaintiff appealed, and was granted a re-hearing, which took place on March 10, 2013, and Plaintiff was again found guilty and sentenced to 24 months in disciplinary segregation. (*Id.* at 9.) He was recommended for transfer to ESP to serve the remainder of his disciplinary segregation term and arrived at ESP on April 10, 2013. (*Id.*) He was granted a 30-day reduction of his disciplinary segregation sanction as of March 24, 2013, with a new release date from disciplinary segregation of November 24, 2014. He received another 30-day reduction, putting his disciplinary release date on October 24, 2014. (*Id.*) On August 14, 2013, it was noted that his disciplinary sanction was further reduced from 24 months to 12 months, and with his other reductions, this put his release date of October 25, 2013. (*Id.*) After October 25, 2013, Plaintiff was placed in administrative segregation at ESP, where he remained until he was

transferred to HDSP on February 11, 2015. (*Id*. at 9-12.) Thus, Plaintiff was in disciplinary segregation at LCC from December 24, 2012, until April 10, 2013, and then at ESP from April 10, 2013 until October 25, 2013, or a total period of approximately 10 months.

This claim is focused on whether Plaintiff's confinement in disciplinary segregation gave rise to a liberty interest that triggered the due process protections outlined in *Wolff*.

Plaintiff now claims that he also has an implicated liberty interest because he asserts that he lost over $1000 in property in connection with his disciplinary conviction. Plaintiff is correct only insofar as this may give rise to a liberty interest that requires he be provided procedural protections with respect to his property.

The court will now address whether Plaintiff had a liberty interest giving rise to the due process protections in the context of a disciplinary proceeding.

Defendants assert that while an inmate is in disciplinary segregation his freedom is significantly curtailed. They state that generally, inmates are allowed up to one hour each day out of their cells for exercise. Inmates in segregation receive the same food, in the same portions, as inmates in general population; however, they must eat in their cells. Inmates in segregation are allowed weekly use of cleaning supplies to clean their cells. Contrary to what Plaintiff alleges, Defendants maintain that inmates in segregation are not required to use their toothbrush or toothpaste to clean their living quarters. Once an inmate completes the discipline, he may receive his electronics and other privileges. While in disciplinary segregation, an inmate's canteen orders are limited. Inmates in segregation are entitled to send and receive mail, and may also have one personal phone call per day. (Drummond Decl., ECF No. 337-23.) In addition, Defendants assert that Plaintiff had access to the canteen during this time period, and made a variety of purchases. (ECF No. 337-9.)

Plaintiff asserts that before December 18, 2012, he was allowed tier time outside of his cell to shower, use the phone and socialize, and access to the yard all day everyday except for brief periods when he was locked in his cell for count. He was able to live in a cell with his best friend, and walk to the dining hall to eat healthy food and socialize. In his cell, he had a television, video games, an electric guitar with an amplifier, a boom box, a cd player, a radio, books, magazines, pens, paper, pencils and a large selection of art supplies. He could come and go from his cell as he pleased, and play group sports and workout with other inmates. He attended college classes and was working toward a degree in business. He had a job in his unit. He could purchase items from the canteen, and could receive clothing and food packages every quarter. He was not handcuffed or shackled, and could shower whenever he wanted, as often as he wanted, in clean showers with temperature controls. He could make as many phone calls to as many people as he wanted, and talked to his wife on the phone every day, and talked to family members and friends multiple times a week. He had regular contact visits, once or twice a week. At night it was quiet and comfortable in his cell. (ECF No. 120 at 11-13.)

When he entered disciplinary segregation, almost all of his property was taken, and he was kept locked in his cell 24 hours a day except for showers every couple of days, a visit once a month, and being pulled out of his cell for hearings. He was not allowed any outdoor recreation. The food in segregation at LCC was often cold and the portions were smaller than those served to others. There was no socialization, and all movement outside the cell was with his arms and legs cuffed and shackled. All of his appliances were taken away, as well as most of his art supplies, his guitar and amplifier, and most of his books and magazines. He could no longer go to school or the gym, and could not go to the yard for fresh air or sunlight. He could not workout outside of his cell or play sports. He could not purchase items from the canteen that he had

before. He could not purchase food from the canteen, which caused daily hunger pains. He could not get food or clothing packages. His phone calls were reduced to one 30-minute call per month, and he was allowed only one non-contact visit per month while handcuffed and shackled. (*Id*. at 13-14.)

He was transferred to ESP on April 9, 2013. He was given a CD player with a radio and his fan. He was placed in a filthy cell that took days to clean, and was given only a small amount of toothpaste and toilet paper to clean with. He got an hour in a small, enclosed space without a roof every day or two. Temperatures were below zero in the winter. He was in a cold, 7 feet by 13 feet cell for 23 to 24 hours a day. He was surrounded by mentally ill persons who would scream, yell and bang, and frequently flood the tier with dirty toilet water. He had to be stripped out any time he left his cell. He could not purchase food from the canteen, or to have "hobbycraft" or packages. He could not attend classes or chapel. Communal nail clippers were brought around for inmates to use every two to three weeks. The food portions were minimal, and he claims he rapidly lost weight and muscle mass. He could shower once every three days. To shower he had to kneel in stagnant water and the guard controlled the water. He got one 15-minute phone call per month, and one non-contact visit per month. (*Id*. at 14-17.)

Plaintiff references LCC OP 509, which governs protective segregation housing at LCC, which is where Plaintiff was housed prior to the incident with Bobadilla. (ECF No. 343-7 at 41-47; ECF No. 343-7 at 48-54.) LCC OP 509 states that inmates in protective segregation are afforded the same general living conditions and privileges as inmates in general population. (*Id*. at 42, 49.)

LCC's OP 733 governs disciplinary segregation at LCC. (ECF No. 343-7 at 55-121; ECF No. 343-8 at 1-7.)[5] Inmates in disciplinary segregation at LCC are allowed personal property as stated in OP 711, but are limited in terms of what appliances and electronics they can have. Inmates are fed the same meals and portions as inmates in general population. Inmates can purchase up to $35 in canteen items per week, and major appliances can be purchased on a one-time basis (and subsequently this was limited to purchase items for hygiene maintenance or correspondence). (*Id*. at 56; ECF No. 343-8 at 3-4.) Inmates in disciplinary segregation at LCC are limited to two personal telephone calls per month (which was subsequently changed to one personal call per week), and unlimited legal calls. Sending and receiving mail is not restricted. Inmates in disciplinary segregation at LCC retain the right to legal visits and non-contact personal visits (two hours). Reading materials and religious texts (Stated-owned and personal) are allowed, and inmates have access to the library cart. Inmates are to be given a minimum of 8 hours of outdoor exercise per week, with 10 hours being the goal, but this was subsequently adjusted to 6 hours outdoor exercise per week with 7 hours being the goal. Inmates have access to law clerks and legal materials. (ECF No. 343-7 at 57; ECF No. 343-8 at 3-4.) Inmates in disciplinary segregation are to be afforded showers three times a week, and may be offered more often as staffing and time permit. (ECF No. 343-7 at 58; ECF No. 343-8 at 4.)

Plaintiff also points to ESP Operational Procedure 722, which governs segregation unit operations at ESP.  (ECF No. 343-23 at 21-54; ECF No. 343-8 at 39-64.) Inmates in disciplinary segregation at ESP may have personal hygiene items, religious materials, clothing items, and limited other items. Inmates in disciplinary segregation are not allowed to access electronic items

---

[5] He also references the version of OP 733 effective February 2015; however, he was not in disciplinary segregation at LCC in 2015; therefore, this version is not relevant.

for at least 60 days. After 60 days, the inmate can request consideration to be allowed one appliance through their personal property. After another 60 days, the inmate can request consideration for one additional appliance approval. The inmate may have no more than 2 appliances while in disciplinary segregation. (343-23 at 29; ECF No. 343-8 at 45, 47.)

Inmates in disciplinary segregation are authorized one non-contact visit with only family members per calendar month with waist and leg restraints in place. (343-23 at 31; ECF No. 343-8 at 48.) Meals for segregation inmates are the same as the master menu for general population inmates, though meals are served in the cells. (343-23 at 33; ECF No. 343-8 at 48-49.)

Inmates in disciplinary segregation are to receive a minimum of five hours per week of outdoor exercise. (ECF No. 343-23 at 40; ECF No. 343-8 at 56.) Inmates in segregated housing are to be afforded a shower at least three times a week. (343-23 at 42; ECF No. 343-8 at 57.)

Personal telephone calls are limited to 15 minutes, and legal calls may be limited to 30 minutes. Disciplinary segregation inmates are limited to one personal telephone call per month. (ECF No. 343-23 at 44; ECF No. 343-8 at 59.) Inmates in administrative segregation, by contrast, are entitled to make one personal telephone call per week. (*Id.*)

Inmates in segregation may not physically attend education courses, but education is available through correspondence courses and institutional television, and inmates may check out books from the library. (ECF No. 343-23 at 45; ECF No. 343-8 at 60.)

ESP OP 260 governs inmate hobbycraft, and states that hobbycraft is not allowed when the inmate is in administrative segregation or disciplinary segregation. (ECF No. 343-24 at 19.)

The court finds that there is a genuine dispute as to whether the conditions Plaintiff faced in disciplinary segregation at LCC and ESP amount to an atypical and significant hardship. According to Defendants, the conditions were harsher than in unsegregated prison, but did not

present a dramatic departure from those conditions. Plaintiff, on the other hand, presents

evidence that the fact finder could interpret as a dramatic departure from the conditions he faced

while housed in protective segregation. In particular, Plaintiff disputes that he was permitted to

have outdoor exercise every day, that he was given clean showers or adequate meals, among

other things. Moreover, Plaintiff maintains that his access to phone calls and visitation, and all

human contact, were significantly curtailed while in disciplinary segregation.

Assuming, without deciding, that Plaintiff was confined in conditions in disciplinary

segregation that amount to an atypical and significant hardship, the court will now address

whether Plaintiff was provided with adequate procedural protections in the context of his

disciplinary hearing.

### 3. Due Process

#### a. Carpenter

##### i. Notice of Hearing

Plaintiff alleges he was not given adequate notice of the hearing.

*Wolff* "provides little guidance as to the specificity of notice necessary to satisfy due

process." *Zimmerlee v. Keeney*, 831 F.2d 183, 188 (9th Cir. 1987). In *Zimmerlee*, the Ninth

Circuit found that notice was adequate where it provided facts and dates sufficient to allow the

inmate to marshal facts for his defense. *Id*.

The charges were written on December 20, 2012. (ECF No. 343 at 43.) The notice clearly

states that Plaintiff was being charged with assault and battery and contained a report of violation

which adequately describes the basis for the charges. (*Id*.)

Plaintiff acknowledges that he was served with the notice of charges on

December 20, 2012, at 3:17 p.m. (ECF No. 343-9 at 64.) Plaintiff had his initial hearing on

December 24, 2012, more than 24 hours after being served with the notice. (ECF No. 343-15.)

He had his re-hearing on March 10, 2013. (ECF No. 343 at 44.)

The notice of charges certainly contained adequate detail to advise Plaintiff what he was

being charged with, and he was served with it sufficiently in advance of the hearings. Therefore,

his due process rights were not violated in connection with having advanced written notice of

charges before the hearings. Summary judgment should be granted in Carpenter's favor as to this

aspect of the due process claim in Count II, and Plaintiff's motion should be denied as to this

claim.

### ii. Evidence Relied Upon

Plaintiff alleges that Carpenter did not include the evidence relied upon and reason for the

discipline in the written disposition.

Inmates are entitled to a "written statement of the factfinders as to the evidence relied

upon and the reasons for the disciplinary action taken." *Wolff*, 418 U.S. at 563-564.

Carpenter states in the form under "evidence relied on for disciplinary hearing": "The

officer's report supports the charges. The inmate witness Oflarety [sic] was not believable in his

testimony of events prior to the incident." (ECF No. 343 at 45.)

Plaintiff argues that Carpenter did not explain the evidence relied upon in a way that the

factual basis for the conviction could be discovered. It is abundantly clear, however, that the

basis for the conviction was that Carpenter believed Officer Jenkins' version of events set forth in

her report over Plaintiff and the witnesses he called to corroborate his version of events. Plaintiff

may disagree with Carpenter's conclusion, but that is not a basis for a due process challenge.

While Carpenter's explanation could have been more detailed, the court does not find it to be

1  constitutionally deficient. Therefore, the court does not find Plaintiff's due process rights were

2  violated in this regard, and summary judgment should be granted in Carpenter's favor as to this

3  aspect of the due process claim in Count II, and Plaintiff's motion should be denied as to this

4  claim.

5  ### iii. Witnesses

6       The right to call witnesses in a prison disciplinary proceeding is a qualified right. Prison

7  officials must make individualized determinations to limit the calling of witnesses. *See Ponte v.*

8  *Real*, 471 U.S. 491, 497 (1985); *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003);

9  *Mitchell v. Dupik*, 75 F.3d 517, 525 (9th Cir. 1996). Prisoners have no right to cross-examine

10  witnesses in prison disciplinary hearings. *See Wolff*, 418 U.S. at 567-68.

11       "[T]he inmate's right to present witnesses is necessarily circumscribed by the penological

12  need to provide swift discipline in individual cases." *Ponte*, 471 U.S. at 495. "The right is

13  additionally circumscribed by the very real dangers in prison life which may result from violence

14  or intimidation directed at either other inmates or staff." *Id*. The right to call witnesses is "subject

15  to the 'mutual accommodation between institutional needs and objectives and the provisions of

16  the Constitution….'" *Id*. (quoting *Baxter v. Palmigiano*, 425 U.S. 308 (1976)).

17       "'Prison officials must have the necessary discretion to keep the hearing within

18  reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine

19  authority[.]'" *Id*. (quoting *Wolff*, 418 U.S. at 566.) In addition, prison officials have discretion to

20  refuse to call witnesses for other reasons such as "irrelevance [or] lack of necessity." *Wolff*, 418

21  U.S. at 566. The proffered reasons for not allowing a witness must be "logically related to

22  preventing undue hazards to 'institutional safety or correctional goals[.]'" *Ponte*, 471 U.S. at 487.

23

Prison officials should explain "in a limited manner, the reason why witnesses were not allowed to testify," either as part of the record in the disciplinary hearing, or later in connection with a court proceeding. *Ponte*, 471 U.S. at 497. With these limitations in mind, the Supreme Court conceded that a constitutional challenge to a refusal to call witnesses may rarely, if ever, be successful. *Ponte*, 471 U.S. at 499.

Plaintiff contends that Carpenter did not allow him to call every witness, and he was not allowed to confront Bobadilla, or to question Olivas, who was the charging employee.

Defendants submit the transcript of Plaintiff's disciplinary re-hearing on March 10, 2013. (ECF No. 337-11.) First, Plaintiff asked to call Keener. (*Id.* at 3, 3:13-14.) Plaintiff indicated he would ask Keener about what witness list Keener came up with, and all of the documents he came up during his investigation. (*Id.* at 3, 3:15-21.) Carpenter indicated he would not allow Keener, because he did not think Keener would have anything relevant to this notice of charges. (*Id.* at 3, 4:1-2.) Carpenter later stated that he (Carpenter) did not have anything from Keener, and whatever information Keener came up with would not be used in the hearing. (*Id.* at 7, 20:7-14.)

Next, Plaintiff asked to call Jenkins, and Carpenter approved this. (*Id.* at 3, 4:5-7.) Then, Plaintiff asked to call Whiting, who was also approved. (*Id.* at 3, 4:8-10.) Carpenter also approved Officer Ortiz. (*Id.* at 3, 4:12-25, 5:1-7.)

Plaintiff then sought to call Officer Vallaster, who was assigned to search and escort supervising the outside of the dining hall, to ask what he saw. (*Id.* at 3, 5:9-25.) Carpenter indicated that he might allow this witness to testify about placement depending on whether it was necessary given what others might testify to. (*Id.* at 7, 21:4-18.)

Next, Plaintiff asked to call Officer Gonzales, who was a responding officer. Carpenter indicated he would probably not allow Gonzales because by the time Gonzales got there, he would have just seen inmates on the ground. Plaintiff indicated he wanted Gonzales to talk about positioning. Carpenter asked whether Plaintiff could rely on the other officers' testimony like this, and Plaintiff indicated he could ask these questions of Whiting. (*Id.* at 4, 6:3-25.)

Plaintiff then requested Olivas, to ask about a discrepancy in the notice of charges where Plaintiff claimed that she added to the violation something that was not in either of the reports: that Breland grabbed Bobadilla around the neck, forcing Bobadilla to the ground while Plaintiff continued to throw punches while Bobadilla was on the ground. Carpenter indicated that he would stipulate that Olivas would have to go with what the reports said. (*Id.* at 4, 7:3-25, 8:1-15.) In addition, while Olivas wrote the notice of charges, Olivas was not present during the altercation, and the charges were based on the reports of Jenkins and Whiting.

Then, Plaintiff asked to call Ward, whom Plaintiff claimed did the initial interviews in operations, and because the report attributed to Jenkins also had Ward's name on it. Carpenter said the report had Ward's name on it because Jenkins had emailed the report in to him. Plaintiff said he wanted to ask Ward why the reports were not written before the end of the shift. Carpenter determined that was not going to be relevant to what was going on and he would not allow Plaintiff to call Ward. (*Id.* at 4, 8:19-25, 9:1-25.)

Plaintiff then requested Officer Howard, who was on the night shift, to testify about a statement Jenkins made in the visiting holding cell after the incident. Carpenter did not allow Plaintiff to call Howard, because it was not relevant to the charges, and said Plaintiff could resolve that separate issue of Jenkins making an allegedly unprofessional comment through the

1 grievance process. (*Id*. at 5, 10:7-25, 11:1-4.) He then asked to call Officer Pope for the same

2 purpose, which Carpenter also did not allow. (*Id*. at 5, 11:9-13.)

3    Plaintiff asked to call Officer Rigney as a witness, who was a responding officer and

4 Plaintiff claimed saw the positioning of the inmates, and was present in medical during the

5 examinations. Carpenter said that he did not need Rigney to tell him what Plaintiff said, because

6 Plaintiff could tell him in his own words. In addition, Carpenter would not let Plaintiff ask

7 Rigney about Bobadilla, but Plaintiff could say what happened in his own words. Furthermore,

8 Carpenter found that the other officers could testify to positioning. (*Id*. at 5, 11:22-25, 12:1-25.)

9 Plaintiff asked to call Officer Harrington for the same reason as Rigney, and Carpenter also

10 decided Plaintiff could not call Harrington for the same reasons. (*Id*. at 5, 12:3-8.)

11    Plaintiff then requested staff psychologist Hornsby (or Ohnsby), who Carpenter said was

12 not in the dining hall. Plaintiff said it was relevant to Bobadilla making comments about him to

13 other inmates. Carpenter said that Hornsby would not testify about what Bobadilla said, because

14 that would be hearsay and would not be considered. (*Id*. at 5, 12:9-25; 6, 14:1-7.)

15    Plaintiff sought to call caseworker Harkreader, whom Plaintiff said may have spoken to

16 inmates who witnessed the incident. Carpenter said he would be a third party and intimated this

17 would also be hearsay. (*Id*. at 6, 14:8-13.)

18    Plaintiff asked to call Dr. Scott, whom Plaintiff said he spoke to regarding the wound that

19 was inflicted on inmate Bobadilla, and Plaintiff had spoken to Dr. Scott about whether Plaintiff

20 could have stabbed Bobadilla with a pencil. Carpenter said he doubted that a doctor talked with

21 Plaintiff about someone else's injuries. Carpenter did not allow Plaintiff to call Dr. Scott, saying

22 that under HIPPA, Dr. Scott was not going to discuss another person's injuries. Plaintiff indicated

23 he wanted Dr. Scott to provide an opinion based on his experience of seeing stab wounds.

Carpenter said that to be relevant, he would have to discuss Bobadilla's injuries, and Carpenter would not allow it. (*Id*. at 6, 15:1-25, 16:1-11.)

Plaintiff then requested to call unidentified medical staff that treated Bobadilla and himself to verify their injuries. Plaintiff asked if they had the photographs of his injuries, and Carpenter ultimately said he would not have an issue with Plaintiff having a copy of the pictures of his own injuries. (*Id*. at 6, 16:16-25, 17:1-24.) Carpenter said, however, that he would not allow Plaintiff to call the unidentified medical staff, because insofar as Plaintiff wanted them to discuss Plaintiff's injuries, Carpenter could see Plaintiff's injuries. (*Id*. at 7, 18:13-16.)

Plaintiff asked to call Officer Spencer who "rolled up" Plaintiff's property, which Plaintiff said was relevant to the pencil with his initials on it, because Plaintiff claimed that he does not have any property with his initials on it. Carpenter said he would stipulate to that. (*Id*. at 7, 19:5-13.) Plaintiff also asked to call Officer Lorton for the same purpose, and Carpenter denied him pursuant to the same stipulation. (*Id*. at 7, 19:21-25, 20:1-2.)

The last staff member Plaintiff sought to call was Officer Barros, but Plaintiff clarified that he only wanted to call Barros if the pictures were not available, but since they were Barros would not be necessary. (*Id*. at 7, 20:3-6.)

Plaintiff then said he wanted to call 13 inmates as witnesses. Carpenter asked if they were each going to say something different from each other. (*Id*. at 8, 22:5-12.) Plaintiff mentioned inmate Dawson (*id*. at 8, 22:16-18), and Andre Breland (*id*. at 8:21). Carpenter had done Breland's disciplinary hearing, and stipulated that Breland would say what he said in his hearing. (*Id*. at 8, 22:22-25, 9:1-9.) Plaintiff also mentioned Sean O'Flaherty, and Carpenter said he would allow this inmate to testify. (*Id.* at 8, 23:14; 24:24-25.) .) Dawson had gone home, but Carpenter had his statement from Plaintiff's last hearing. (*Id.* at 8, 23:18-23.)  Specifically, if O'Flaherty

29

also testified that Bobadilla struck Plaintiff first, Carpenter said he would stipulate that is what Dawson would testify to. (*Id.* at 8, 25:1-11.) Plaintiff also requested to call inmate Santana, which Carpenter allowed. (*Id.* at 8, 25:14; 9, 28:5-11.) The remaining inmates would testify to the same things as these witnesses, and Carpenter indicated he did not need 20 people to tell him the same thing. (*Id.* at 9, 28:13-24, 29:16-20.)

Finally, Plaintiff asked to call Bobadilla, which Carpenter rejected because he said he would not allow Plaintiff to call the alleged victim. (ECF No. 337-11 at 10, 30, 10-15.)

The court finds that Carpenter set forth legitimate reasons for denying some of Plaintiff's witnesses that are logically related to the correctional goal of providing swift discipline. Carpenter was also justified in not allowing Plaintiff to call Bobadilla, as he was the alleged victim. In addition, Plaintiff takes issue with not being allowed to call Olivas, but Carpenter stipulated that there was an error in the notice of charges that Plaintiff pointed out was not supported by the reports. Otherwise, witnesses were disallowed because they would be redundant or would not provide relevant information.

The court finds that Plaintiff's due process rights were not violated by Carpenter with respect to his right to call witnesses in his disciplinary hearing.

#### iv. Impartial Hearing Officer

Plaintiff argues that Carpenter was not impartial.

Due process requires an unbiased hearing officer. *See Edwards v. Balisok*, 520 U.S. 641 (1997). In *Wolff*, the Supreme Court appears to have defined impartiality in terms of the absence of a "hazard of arbitrary decision making." *Wolff*, 418 U.S. at 571. This District has likewise held that the Due Process Clause guarantees inmates a right to impartial disciplinary hearings. *See Willoughby v. Luster*, 717 F.Supp. 1439, 1441 (D. Nev. 1989) (citations omitted). This does not

require that the disciplinary hearing officer come from outside the prison because "[i]n general, prison officials and administrators are quite capable of conducting impartial hearings." *Id*. (citing *Ruley v. Nev. Bd. of Comm'rs*, 628 F.Supp.108, 112-13 (D. Nev. 1986)). "[A] prison official who witnesses or investigates an incident," however, "cannot sit on a disciplinary committee that determines whether a particular inmate was guilty of any wrongdoing in that incident." *Id*. (citations omitted).

Plaintiff argues that Carpenter's bias is evidenced by the fact that Carpenter addressed Plaintiff as "dude" during the hearing, and that Carpenter said he was not going to have officers sitting in the hearing for "close to an hour." Plaintiff also claims that Carpenter was answering for witnesses, and interrupted Plaintiff and withheld exculpatory evidence. Plaintiff further asserts that Carpenter's boss was Olivas, who wrote the notice of charges. Finally, he argues that Carpenter spent no time deliberating before finding Plaintiff guilty when Plaintiff was "obviously" innocent.

Plaintiff provides no evidence that Carpenter was biased, but merely his speculation that this must have been the case. This is insufficient to demonstrate impartiality or raise a genuine dispute of material fact as to Carpenter's impartiality. *See Matsushita*, 475 U.S. at 587. Plaintiff must go beyond assertions and allegations and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324. Simply repeating the vague allegations of his pleadings, without providing any factual evidence to support it is insufficient to demonstrate a violation of his rights. *See Far Out Productions, Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001) (affidavits that did not present any specific facts to support the claims were insufficient to preclude grant of summary judgment). "The burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific

1    facts, as opposed to general allegations, that present a genuine issue worthy of trial." 10A

2    Wright, et. al., *Federal Practice and Procedure* § 2727.2 (4th ed. 2008).

3          The fact that Carpenter referred to Plaintiff in an informal manner does not reveal bias.

4    That Carpenter said he was not going to have officers sitting in the hearing for "close to an hour"

5    also does not support a finding of bias, but instead reflects *Wolff's* statement that hearing officers

6    must have the necessary discretion to keep the hearing within reasonable limits. Plaintiff's pure

7    speculation that Carpenter was biased because Olivas was his boss is also insufficient to create a

8    genuine dispute of material fact since, in general, prison officials and administrators are quite

9    capable of conducting impartial hearings. There is also no evidence to support Plaintiff's claim

10   that Carpenter was intentionally withholding exculpatory evidence. Finally, the court cannot

11   impute bias to Carpenter because of the length of time it took him to render his decision.

12                          **v. Evidence to Support the Decision**

13         Finally, Plaintiff argues that the decision was not supported by any evidence.

14         "[T]he requirements of due process are satisfied if *some evidence* supports the decision

15   by the prison disciplinary board[.]" *Hill,* 472 U.S. at 455 (emphasis added). This "does not

16   require the examination of the entire record, independent assessment of the credibility of

17   witnesses, or weighing the evidence. Instead, the relevant question is whether there is any

18   evidence in the record that could support the conclusion reached by the disciplinary board." *Id*. at

19   455-56 (citations omitted).

20         In *Hill,* the Court "decline[d] to adopt a more stringent evidentiary standard as a

21   constitutional requirement." *Id*. at 456. It explained: "Prison disciplinary proceedings take place

22   in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of

23   evidence that might not be sufficient in less exigent circumstances." *Id*. (citation omitted). The

1  Court went on to state: "The Federal Constitution does not require evidence that logically

2  precludes any conclusion but the one reached by the disciplinary board, instead due process in

3  this context requires only that there be some evidence to support the findings made in the

4  disciplinary hearing." *Id*. at 457. "Nonetheless there must be some indicia of reliability of the

5  information that forms the basis for prison disciplinary actions." *Cato v. Rushen*, 824 F.2d 703,

6  705 (9th Cir. 1987) (citing *Mendoza v. Miller*, 779 F.2d 1287, 1295 (7th Cir. 1985), *Kyle v.*

7  *Hanberry*, 677 F.2d 1386, 1390-91 (11th Cir. 1982)).

8       Plaintiff argues that the "some evidence" standard does not apply here, relying in part on

9  *Hines v. Gomez*. In *Hines v. Gomez*, 108 F.3d 265 (9th Cir. 1997), the inmate alleged that a

10  prison guard falsely charged him with a rule violation and that the hearing officer falsely found

11  him guilty. He asserted that they both acted in retaliation for his previous use of the grievance

12  system. The Ninth Circuit stated that it had to determine whether there was substantial evidence

13  that the guard charged the inmate in retaliation for his use of the prison's grievance process. The

14  guard argued that the district court should have applied the less demanding "some evidence"

15  standard to this inquiry. The Ninth Circuit noted that in a *retaliation* claim, the inmate must

16  demonstrate that the adverse action (the disciplinary charge) was taken because of the inmate's

17  protected activity (utilizing the grievance process), and that the adverse action did not advance a

18  legitimate penological interest. *Id.* at 267. In considering the guard's argument, the court

19  reiterated that in *Hill*, the Supreme Court held that courts apply the "some evidence" standard to

20  the findings of a prison disciplinary board that an inmate is guilty of a rule violation. *Id.* at 268.

21       The court then considered whether the "some evidence" standard should apply "not only

22  to a prison disciplinary board's finding of a rule violation, but also to a prison guard's initial

23  accusation of a rule violation where the guard's accusation itself allegedly is false and

33

retaliatory." *Id*. The court held that "[w]here a prisoner alleges a correctional officer has falsely accused him of violating a prison rule *in retaliation* for the prisoner's exercise of his constitutional rights, the correctional officer's accusation is not entitled to the 'some evidence' standard of review that we afford disciplinary administrative decisions." *Id.* at 269 (emphasis added).

In *Bruce v. Ylst*, 351 F.3d 1283 (9th Cir 2003), Bruce alleged that he was validated as a gang member in retaliation for having filed grievances. He also argued he was denied due process because there was insufficient evidence to validate him as such. The court reaffirmed that the due process claim "is subject to the 'some evidence' standard of *Superintendent v. Hill*[.]" *Id*. at 1287. The court concluded there was "some evidence" in the record to support the conclusion Bruce had ties to a gang. With respect to his retaliation claim (that he was retaliated against when he was validated as a gang member because of his grievance filing), the court concluded that the inmate had set forth evidence of retaliatory motive sufficient to defeat the defense's motion for summary judgment. The court noted that the plaintiff had the burden to prove the absence of a legitimate penological goal in a retaliation claim. The defense had argued that because there was "some evidence" and because gang validation procedures served the valid penological purpose of safety and security, it was proper to grant summary judgment. The Ninth Circuit said that it had previously held in *Hines* that the "some evidence" standard did not apply to retaliation claims. Instead, the "some evidence" standard applies to due process claims attacking the result of a disciplinary board's proceeding, and not the officer's retaliatory accusation. *Id*. at 1289.

Plaintiff is asserting a due process claim against Jenkins here, and not a retaliation claim, and therefore, the "some evidence" standard applies. Plaintiff has a retaliation claim, which is

1 discussed below, but it alleges that Plaintiff was retaliated against when his book request was

2 delayed and there was interference with his mail.

3     Plaintiff also argues that the Ninth Circuit's decision in *Nonnette v. Small*, 316 F.3d 872,

4 878-79 (9th Cir. 2002), supports his contention that the "some evidence" standard should not

5 apply here. Plaintiff focuses on language in *Nonnette* that Nonnette's "entire challenge to the

6 administrative segregation was that it was imposed as a result of a disciplinary hearing in which

7 the adverse finding was supported by no evidence." *Nonnette*, 316 F.3d at 878. The court said:

8 "We have held that such a lack of a fair hearing violates due process, wholly apart from the

9 conditions of confinement and without regard to *Sandin* requirements." *Id.* at 879 (citing

10 *Burnsworth v. Gunderson*, 179 F.3d 771, 775 (9th Cir. 1999)). In *Burnsworth,* the Ninth Circuit

11 said: "It is incorrect to state that due process is not violated when a prison disciplinary hearing

12 board convicts an inmate of escape after the board holds a hearing at which no shred of evidence

13 of the inmate's guilt is presented." *Id.* at 774 (citing *Hill*, 472 U.S. at 454 (holding that due

14 process is not met unless the findings of the disciplinary board are supported by *some* evidence

15 in the record)).

16     These cases actually reaffirm that the court's inquiry is still focused on whether there is

17 "some evidence" to support the hearing officer's determination. If there is "some evidence," then

18 there is no due process violation. The corollary to that is that if there is *no* evidence to support

19 the determination, then there is a due process violation.

20     Plaintiff also argues that the "some evidence" standard only applies when the disciplinary

21 hearing is held under *exigent* circumstances, but not when it is held under something other than

22 *exigent* circumstances. This is not what the law provides. Plaintiff appears to rely on the

23 following language in *Hill*: "Prison disciplinary proceedings take place in a highly charged

atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances." *Hill*, 472 U.S. at 456 (citing *Wolff*, 418 U.S. at 562-63, 567-69) . The Court specifically said that prison administrators must *often* act swiftly, but it did not limit its holding that prison disciplinary decisions must be supported by "some evidence" to satisfy due process to only those cases that arise under exigent circumstances. Moreover, Plaintiff has cited no authority, and the court aware of none, holding that the "some evidence" standard only applies to discipline proceedings held under exigent circumstances.

Plaintiff also relies on *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001), in arguing that the "some evidence" standard should not apply. *Devereaux* arose from an investigation and prosecution for alleged sexual abuse of foster children. There, the Ninth Circuit held that "there is a clearly established constitutional due process right not to be subjected to *criminal charges* on the basis of false evidence that was deliberately fabricated by the government." *Devereaux*, 263 F.3d at 1074-75. *Devereaux's* holding explicitly applies to *criminal charges*. Again, Plaintiff has cited no authority, and the court is aware of none, extending the holding of *Devereaux* to prison disciplinary proceedings.

The court will now assess whether there was "some evidence" to support Plaintiff's finding of guilt.

Carpenter determined that Jenkins' report supported the charges and found Plaintiff's witness O'Flaherty's testimony was not credible. Jenkins' report states that she was assigned in the dining hall, and as she was watching movement in the dining hall she observed Plaintiff approach Bobadilla and take a swing at him in the upper chest appear with a motion like he had a weapon in his hand and was attempting to stab Bobadilla. Bobadilla had a tray in his hands and appeared to shield himself. Plaintiff then began to swing at Bobadilla, and inmate Breland

1  grabbed Bobadilla with his right arm in a choke hold around the neck and began to punch him in

2  the upper left top of the head while Plaintiff was still punching Bobadilla. Jenkins yelled for the

3  inmates to get down on the ground and called for backup.

4      The inmates did not go to the ground when directed, and she told Whiting to fire a round,

5  but when he did not rack the "popper," she assessed the situation and did not approach the

6  inmates. She then saw Ortiz arrive at the window and heard him rack a round and noticed that

7  backup had arrived. She then approached Breland, who was on the ground on top of Bobadilla

8  holding him in a chokehold. She grabbed Breland and pulled him off of Bobadilla. Vallaster and

9  Gonzales were there at this time and assisted in placing the inmates into restraints. The inmates

10  were taken to visiting holding and assessed by medical. Officer Vallaster observed and removed

11  a pencil that was on the ground. She noted that Bobadilla appeared to have a mark in the chest

12  area that was the size of the pencil. (ECF No. 343 at 40-41.)

13      While Plaintiff disagrees with Jenkins' version of events, and even accepting Plaintiff's

14  claim as true that there was no pencil involved, there is "some evidence" to support Carpenter's

15  finding that Plaintiff was guilty of assault and battery because Jenkins said in her report that she

16  saw Plaintiff swing at Bobadilla and Bobadilla used his tray to deflect Plaintiff, and then she

17  observed Plaintiff punching Bobadilla. This supports the charges of assault and battery. There is

18  some indicia of reliability of the report because Jenkins testified at the hearing in a similar

19  fashion. She testified that Bobadilla was standing next to Plaintiff when Plaintiff stood up and

20  advanced towards him, which is what caught her attention, and that is when the fight occurred.

21  She testified that she observed Plaintiff swing at Bobadilla, and she did not see Bobadilla throw a

22  punch at Plaintiff. (ECF No. 337-11 at 11-14.) Further indicia of reliability is that Bobadilla

23

1  reported to medical after the incident that when he was walking to clean up, another inmate

2  lunged at him with an object and then the fight was on and he was hit multiple times.

3  (ECF No. 343-13.) Bobadilla similarly stated in his motion to dismiss that he was going to wipe

4  the table, when Plaintiff lunged at him with an object to his chest. Bobadilla blocked this with a

5  dinner tray, and the assault began. (ECF No. 226 at 2-3.) Thus, Bobadilla's statements are

6  consistent with Jenkins' version of events.

7       Plaintiff provides many declarations to support his version of events, but it is not the

8  court's function to reweigh the evidence and make a new determination. Instead, the court is

9  tasked with reviewing the record and determining whether there was "some evidence" to support

10  the hearing officer's determination. The court finds that there was; therefore, summary judgment

11  should be granted in Carpenter's favor as to this aspect of the due process claim in Count II, and

12  Plaintiff's motion should be denied.

13           **b. Jenkins and Olivas**

14       Plaintiff alleges that Jenkins filed a false report, and that Olivas falsified the notice of

15  charges.

16       Courts have held that prisoners do not have a constitutionally guaranteed immunity from

17  being falsely or wrongly accused of conduct which may result in the deprivation of a protected

18  liberty interest. *See Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989); *Freeman v. Rideout*,

19  808 F.2d 949, 951-52 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988) (allegation that false

20  evidence was planted by a prison guard does not state a constitutional claim where procedural

21  protections are provided); *see also York v. Hernandez*, 2011 WL 2650243, at * n. 3 (N.D. Cal.

22  2011) (plaintiff alleged violation of due process rights by filing false charges against him, and

23  court stated, "without more, a prisoner has no constitutionally guaranteed immunity from being

1    falsely or wrongly accused of conduct which  may result in the deprivation of a protected liberty

2    interest"); *Tafilele v. Harrington*, 2011 WL 2462750, at &7 (E.D. Cal. 2011). Rather, the

3    Fourteenth Amendment provides that a prisoner has a right not to be deprived of a protected

4    liberty interest *without due process of law*. *Sprouse*, 870 F.2d at 452. Thus, as long as an inmate

5    receives proper procedural due process, a claim based on the falsity of disciplinary charges,

6    standing alone, does not state a constitutional claim. *Id*.; *see also Hanrahan v. Lane*, 747 F.2d

7    1137, 1140-41 (7th Cir. 1984).

8            The court has found that Plaintiff received proper procedural due process; therefore, he

9    may not maintain a claim against Jenkins that she falsified her report, or Olivas based on the

10   allegation she falsified the notice of charges.

11          Moreover, Plaintiff asserted at the hearing that there was a discrepancy in Olivas' notice

12   of charges because the notice of charges said that Breland grabbed Bobadilla around the neck

13   and forced him to the ground while Plaintiff continued to throw punches, but none of the reports

14   said that Plaintiff continued to punch Bobadilla when he was on the ground. Carpenter stipulated

15   that Olivas would have to "go with what the" reports said, and he would stipulate that was an

16   error in the NOC. (ECF No. 337-11 at 4.)

17          Therefore, summary judgment should be granted in Jenkins' and Olivas' favor as to the

18   due process claims asserted against them in Count II, and Plaintiff's motion should be denied.

19                  **c. Ward**

20          Plaintiff alleges that Ward destroyed evidence before the hearing: that Ward played with

21   the pencil and "destroyed the forensic evidence on it in [his] presence."  Plaintiff does not move

22   for summary judgment against Ward in this claim.

23

There is no evidence in the record that Ward "destroyed" the pencil. Nor is there authority that the court is aware of that an inmate is entitled to a forensic examination in connection with a prison disciplinary proceeding. *See e.g. Okocci v. Klein*, 270 F.Supp.2d 603 (E.D. Pa. 2003), *aff'd by* 100 Fed.Appx. 127 (3d Cir. 2004) (no clearly established right to be provided with a fingerprint analysis of a shank that was found in the inmate's cell). Therefore, summary judgment should be granted in Ward's favor as to the due process claim asserted against him in Count II, and Plaintiff's motion should be denied.

### d. Exculpatory Evidence- Keener and Carpenter

Plaintiff alleges that Keener did not conduct a meaningful investigation as he did not take fingerprints or DNA from the pencil Plaintiff alleged used, and he suppressed exculpatory evidence by withholding and/or destroying including: (a) photographs of Bobadilla's alleged injuries from the incident with Plaintiff as well as the incident that occurred two days prior; (b) evidence of the earlier physical fight between Bobadilla and another inmate; (c) medical records of Bobadilla from both incidents; (d) the pencil that Plaintiff allegedly used as a weapon which he never saw again after Ward played with it and destroyed forensic evidence; and (e) exculpatory witness statements exonerating Plaintiff.

Plaintiff alleges Carpenter did not disclose photos and records of Bobadilla's injuries, and Carpenter failed to inform Plaintiff of the fight between Bobadilla and another inmate days before. In addition, he claims that Carpenter did not produce the pencil supposedly used in the right, and did not disclose the results of Keener's investigation.

An inmate facing disciplinary proceedings "should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. The Supreme

Court explained that courts "should not be too ready to exercise oversight and put aside the judgment of prison administrators." *Id*. "It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance the inmate's interest in avoiding [disciplinary segregation] against the needs of the prison, and some amount of flexibility and accommodation is required." *Id*. The right to call witnesses and present evidence "is additionally circumscribed by the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff." *Ponte v. Real*, 471 U.S. 491, 495 (1985).

In a prison discipline setting, the inmate is not entitled to the "full panoply of rights" that are present in a criminal prosecution. *Wolff*, 418 U.S. at 556.

Plaintiff cites a Nevada Supreme Court case, *Aubert v. Walsh*, 131 Nev. 1249 (2015), as supportive of his position. There, the inmate plaintiff argued he was denied due process in a prison disciplinary proceeding when prison officials refused his request to view security camera video evidence in preparation for his defense against assault and battery charges, for which the inmate was then convicted and disciplined. The defendants argued they were not required to produce the footage because the inmate never asserted that it was exculpatory. The court disagreed, finding that the inmate maintained he did not assault anyone or participate in the fight when he was seeking to review the evidence. The court relied on a Seventh Circuit decision that material exculpatory evidence must be disclosed if the inmate timely requests it "unless the evidence would threaten institutional concerns[.]" *Id*. at *1 (citing *Piggie v. McBride*, 277 F.3d 922, 925 (7th Cir. 2002)). The court also cited a Third Circuit case that when an inmate requests the evidence be produced at the hearing, due process requires it be produced unless the hearing officer independently determines the evidence is not relevant, or if relevant, should not be

1 introduced due to overriding penological concerns. *Id.* (citing *Burns v. PA Dept of Corr.*, 642

2 F.3d 163, 174 n. 11 (3d Cir. 2011)).

3       While the Seventh[6] and Third Circuit have indicated that prison officials have a duty to

4 produce exculpatory documentary evidence to an inmate in connection with a prison disciplinary

5 hearing in certain circumstances, neither the Supreme Court nor the Ninth Circuit have weighed

6 in on this issue. While the court certainly does not condone the withholding of exculpatory

7 evidence, and believes it would serve the interests of justice to disclose exculpatory evidence to

8 an inmate when doing so would not have a negative impact on the safety of staff or inmates or

9 prison security, or would otherwise adversely impede prison operations (such as when the

10 request for evidence is irrelevant, repetitive or unnecessary), the law is not clearly established in

11 this regard; therefore, even if the court were to find that these Defendants did withhold or

12 suppress exculpatory evidence, Defendants would be entitled to qualified immunity insofar as

13 Plaintiff claims that these defendants violated the Due Process Clause in failing to provide him

14 with exculpatory evidence. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir.

15 2016) (en banc), *cert. denied*, 137 S.Ct. 831 (Jan. 23, 2017) (qualified immunity applies if the

16 right at issue was not clearly established at the time the defendant acted).

17       Plaintiff also argues that the court should extend the rule of *Brady v. Maryland*, 373 U.S.

18 83 (1963) to prison disciplinary proceedings. *Brady* held that suppression by the prosecution of

19 evidence favorable to an accused upon request violates due process where the evidence is

20 material either to guilt or punishment. *Brady,* 373 U.S. at 87. While the Seventh Circuit has done

21 so, *see Piggie* v. *Cotton*, 344 F.3d 674 (7th Cir. 2003) (citing *Chavis v. Rowe*, 643 F.2d 1281 (7th

22

23

---

[6] *See also See Jones v. Crossi,* 637 F.3d 841 (7th Cir. 2011)*; Piggie* v. *Cotton*, 344 F.3d 674 (7th Cir. 2003).

Cir. 1981)), neither the Supreme Court nor the Ninth Circuit have extended *Brady* to prison disciplinary proceedings. *See Alexander v. Keener,* No. 3:12-cv-0535-MMD-VPC, 2014 WL 11370450, at *3 (D. Nev. Mar. 26, 2014). As such, the law was not clearly established that prison officials were required to produce to Plaintiff any material exculpatory evidence in the context of a disciplinary proceeding under *Brady*.

There are several additional reasons that summary judgment should be granted in Defendants' favor, and Plaintiff's motion for summary judgment should be denied, as to this aspect of his due process claim:

As was discussed above, insofar as Plaintiff claims that Keener improperly failed to conduct DNA or fingerprint analysis on the pencil, Plaintiff had no clearly established right to be provided with such analysis in the context of a disciplinary proceeding. *See e.g. Okocci v. Klein*, 270 F.Supp.2d 603 (E.D. Pa. 2003, *aff'd by* 100 Fed.Appx. 127 (3d Cir. 2004).

Moreover, Plaintiff gave a statement at the hearing that none of his property had his initials on it, and Carpenter stipulated that none of Plaintiff's other property had his initials on it. (ECF No. 337-11 at 7, 19:8-13.)

The court also points out that while Plaintiff alleges that he requested exculpatory evidence from Keener in a kite, the evidence he relies on—his Exhibit B-11—is not a kite to Keener, but appears to be Plaintiff's notes on a paper titled "Kites sent on 3/4/13." Included in the on this page is a reference to Keener, but this is not proof of an actual request sent to Keener.. (ECF No. 343 at 50.) Even if Plaintiff demonstrated he did send this request to Keener, it did not mention the pencil. Nor did it mention the prior incident Bobadilla was allegedly involved in or the medical records from that incident.

Plaintiff also asserts that he sent Carpenter a kite before the second hearing. He refers to his Exhibit B-12, but as with Keener, this is not a kite, but Plaintiff's own notes, with a reference to Carpenter and a general request for "all evidentiary documents you will consider for my disciplinary hearing (including but not limited to, photographs, witness statements, peace officer reports, unit logs, training records, etc.). (ECF No. 343 at 51.) This also did not request information regarding the alleged incident Bobadilla was involved in previously, Bobadilla's medical records, or the pencil.

Plaintiff did request photographs of his own injuries at the hearing, which Carpenter ultimately agreed Plaintiff could have. (ECF No. 337-11 at 6.)

Plaintiff also did not specifically ask Carpenter for Bobadilla's medical records or photographs of Bobadilla's injuries from the incident on December 18, 2012 at the hearing. Nor did he mention the prior incident Bobadilla was allegedly involved in during the hearing. Instead, at the hearing, Plaintiff requested that Dr. Scott be able to testify about whether Plaintiff could have inflicted the wound on Bobadilla with a pencil, which Carpenter did not allow; however, Carpenter did allow Plaintiff to give his own statement, where Plaintiff represented what Dr. Scott told him. Plaintiff said that Dr. Scott told him that if Plaintiff hit Bobadilla in the chest with a sharpened pencil in between the ribs it would puncture through the rib cage and the wound would have been deeper, and that if it was not a direct shot, the pencil would have broken. Plaintiff also told Carpenter in the hearing that after the incident Ward showed him the pencil, and it was not broken, which is what he presumably sought to demonstrate by offering the pencil into evidence. Plaintiff specifically explained to Carpenter that he was trying to show that the pencil was probably never used and if Bobadilla had any wounds they were self-inflicted or inflicted prior to this. (ECF No. 337-11 at 22.)

Carpenter also explained that Dr. Scott could not testify about another person's medical issues because of HIPPA (ECF No. 337-11 at 6, 22), and Plaintiff acknowledged that he could not review Bobadilla's medical records. (ECF No. 337-11 at 22, 80:8-10.)  This was a legitimate reason for precluding Plaintiff from having access to Bobadilla's records or photographs.

Plaintiff does not assert what other "exculpatory" statements Keener would have had or that he requested that they be presented at the hearing with Carpenter.

In sum, the court finds that the law was not clearly established that prison officials have a duty to disclose material exculpatory evidence on request; Plaintiff did not specifically request some of the evidence; and the hearing officer gave legitimate reasons for not allowing the remaining evidence. Therefore, summary judgment should be granted in Carpenter's and Keener's favor as to this aspect of the due process claim, and Plaintiff's motion should be denied.

### e. LeGrand

Plaintiff alleges that LeGrand withheld and refused to respond to requests for unspecified documentary evidence.

LeGrand states in his declaration that he did not falsify, withhold, suppress of destroy any evidence relating to Plaintiff or his disciplinary hearing. (LeGrand Decl., ECF No. 337-7 at 2 ¶ 7.) Instead, he responded to Plaintiff's grievance, 2006-29-54396- regarding his disciplinary hearing and his complaints about the hearing. Due to several issues, LeGrand ordered the matter remanded for a new disciplinary hearing. (*Id*. ¶¶ 8-9.)

Plaintiff presents no evidence that LeGrand withheld or suppressed any evidence. Plaintiff presents a kite he sent to LeGrand asking for a copy of all evidentiary documents that LeGrand considered in making his decision regarding the disciplinary appeal and for the appeal decision. There is a notation on the bottom of the kite that says: "See attached- doesn't change

the findings which was referral back for new disciplinary hearing." (ECF No. 343-1 at 1.)
Attached was the disciplinary appeal memorandum, which referred the matter for a new hearing.

This is not evidence that LeGrand withheld, suppressed or destroyed evidence in connection with the disciplinary hearing, as this request was made after LeGrand had granted Plaintiff a re-hearing. Moreover, Plaintiff did not request any specific evidence, but instead asked for "all evidentiary documents you considered in making your decision regarding my disciplinary appeal … (including, but not limited to, all the witnesses interviewed & their statements, and the photographs of my wounds taken on 12/19/12)?" (*Id*.) Carpenter allowed Plaintiff to have the photographs of his injuries.

Moreover, even if there were evidence that Plaintiff made a request for specific material, exculpatory evidence, the law was not clearly established that LeGrand would have been required to disclose it to comply with due process. Therefore, summary judgment should be granted in LeGrand's favor, and Plaintiff's motion should be denied as to this aspect of the due process claim.

**C. Count III-Retaliation vs Jenkins, Belanger, Miranda, Olivas, and Bequette**

**1. Allegations**

In count III, Plaintiff alleges that in 2009, he filed a grievance against Jenkins for unlawful seizure of property. On December 20, 2012, Fox served Plaintiff with a notice of charges, and Plaintiff said they were a lie. When Plaintiff told Fox that Jenkins falsified her report, he said, "This is prison. That's what happens." Plaintiff alleges, on information and belief, that Fox told Jenkins and other guards about his accusation against her.

Then, on December 21, 2012, during his administrative segregation classification hearing before Belanger, Miranda and another officer, Plaintiff made several verbal requests of Belanger,

requesting that Jenkins be reported for falsifying her report. Plaintiff avers, on information and belief, that Belanger, Miranda and the other officer told Jenkins and other LCC staff of his complaint against Jenkins to try and protect her, instead of reporting his complaint.

On December 25, 2012, Plaintiff submitted a book approval request form to order a prison self-help litigation manual, but this request was not returned to him with an approval until February 12, 2013. Plaintiff claims the delay was in retaliation for his filing complaints against Defendants to keep him from petitioning the government for redress with the assistance of the self-help manual. Before that time, all of his book requests were returned in less than 14 days.

He also contends that Bequette deemed a letter from Plaintiff's wife unauthorized and refused to deliver it to him because it referred to Jenkins. On February 18, 2013, Plaintiff claims that Belanger withheld his mail. Then on February 26, 2013, Olivas responded to his grievance on that issue and further withheld his mail, which Belanger signed off on. Between December 28, 2012 and April 5, 2013, Plaintiff claims that Jenkins, Olivas, and Bequette delayed Plaintiff getting letters from his wife immediately after his complaints against Jenkins, Olivas, Keener, and Belanger.

### 2. Retaliation Standard

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

1  reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v.*

2  *Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

3      "The First Amendment guarantees a prisoner a right to seek redress of grievances from

4  prison authorities as well as a right of meaningful access to the courts." *Id*. (citing *Bradley v.*

5  *Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

6      An inmate must submit evidence, either direct or circumstantial, to establish a link

7  between the exercise of constitutional rights and the alleged retaliatory action. *Pratt*, 65 F.3d at

8  806-07. "[A] plaintiff must show that his protected conduct was the 'substantial' or 'motivating'

9  factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009)

10  (citation and quotation marks omitted). A plaintiff's mere speculation that there is a causal

11  connection is not enough to raise a genuine issue of material fact. *See Wood v. Yordy*, 753 F.3d

12  899, 904 (9th Cir. 2014) (citations omitted) (affirming grant of summary judgment where there

13  was no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants'

14  disparaging remarks were made in reference to the prior lawsuit); *Nelson v. Pima Community*

15  *College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation omitted) ("mere allegation and

16  speculation do not create a factual dispute for purposes of summary judgment").

17      **3. Analysis**

18      Plaintiff's claim can be analyzed by looking at the various alleged adverse action that he

19  claims took place: (1) the delay in the approval of his book request form; (3) a letter from his

20  wife being deemed unauthorized and withheld from him because it supposedly referenced a staff

21  member; (4) his mail otherwise being delayed and withheld between December 28, 2012 and

22  April 5, 2013.

23

### a. Book Request Form

Plaintiff submitted a LCC Inmate Publication Request form for the Prisoner's Self-Help Litigation Manual on December 25, 2012. (ECF No. 337-12 at 10; ECF No. 343-13 at 29.)

On January 30, 2013, Plaintiff sent a kite to Belanger, stating he had submitted the book request on December 25, 2012, and had not received an approval back. He claimed this was impeding his access to information, and asked to have it approved. There is a notation on the form that states: "I do not approve the books." (ECF No. 337-12 at 14.)

Plaintiff filed an informal level grievance on February 4, 2013, stating that on December 25, 2012, he had submitted a request for approval of the Prison Self-Help Litigation Manual, and after 35 days with no response he sent a kite to Belanger and noted the response. He stated that he believed the book was intentionally being delayed to prevent him from exercising his First Amendment rights, in retaliation for his claims against guards. (ECF No. 337-12 at 8.)

Belanger denied the informal level grievance, stating she spoke to him regarding his grievance and brought him his book approval to help resolve the grievance. Belanger noted that the book request was submitted on December 25, 2012, and it was approved on January 11, 2013, with Plaintiff receiving a copy of the approval on February 12, 2013. She indicated that Operational Procedure 751 does not have a timeframe within which approvals have to be processed. She also advised Plaintiff that he submitted his request during the holiday season, and several staff were absent, including members of the book committee, and so it was unfortunate it took longer to get the approval, but assured him it was not done on purpose. (ECF No. 337-12 at 7.)

Plaintiff sent a first level grievance stating that while the book may have been approved on January 11, 2013, he was not informed of its approval until February 12, 2013. He said that

49

members being on vacation was not a justification, and reiterated his belief that the approval was delayed to prevent him from exercising his First Amendment rights. (*Id*. at 5-6.) LeGrand responded to the first level grievance, noting that at the time the book committee reviewed the request, Belanger was part of the committee, but shortly thereafter, Rutherford took over the position. He noted that after the book committee reviews a request it does take some time to collect all the signatures for approval. He stated that no one retaliated against Plaintiff. He also advised Plaintiff that if he was unsatisfied with the timeframe for getting a book approved, he could submit a subsequent book request. (ECF No. 337-12 at 4.) This was reiterated in response to his second level grievance. (*Id*. at 2-3.)

Defendants argue that Belanger pointed out that the request was made during the holidays, which explains the delay, and that there is no evidence of retaliatory motive.

Plaintiff argues that on December 21, 2012, during his administrative segregation hearing before Belanger and Miranda, he told them that Jenkins had falsified her report, and asked that Jenkins be reported. (Pl. Ex. B-34, ECF No. 343-1 at 22[7].) They informed him that the final decision was not up to them. Plaintiff relies on his Exhibit C-61. This exhibit is a case note printout from his due process hearing for administrative segregation. Belanger is listed as the staff member entering the notes. The note reads, in part: "[Plaintiff] kept asking me and the officers at the due process hearing to believe him and if we could be his advocates - we informed him no and that the final decision was not up to us." (ECF No. 343-7 at 1.) Plaintiff asserts that Belanger did not report Plaintiff's complaint against Jenkins.

---

[7] This exhibit appears to contain Plaintiff's handwritten notes with different entries on different dates.

Exhibit C-61 does not demonstrate either that Plaintiff told Belanger and Miranda his contention that Jenkins falsified her report, or that they did not report his complaint. (ECF No. 343-7 at 1.) Instead, it demonstrates that he asked them to believe his version of events regarding what occurred with Bobadilla on December 18, 2012, and they said it was not up to them. Plaintiff also cites his Exhibits C-4 to C-5. These are Belanger's responses to his request for production of documents. (ECF No. 343-6 at 2.) The pages Plaintiff references do not appear to have any relevance to this claim. (ECF No. 343-6 at 5-6.)

Plaintiff then references his Exhibits C-40 to C-41. These are also Belanger's responses to Plaintiff's request for production of documents, which for the most part consist of objections to the requests, but also reference the December 21, 2012 case note discussed above. (ECF No. 343-6 at 41-42.) This does not demonstrate either that Plaintiff informed Belanger that he complained about Jenkins falsifying her report, or that Belanger did not report Jenkins.

Plaintiff also asserts that on December 24, 2012, he told Sergeant Gentry that Jenkins falsified her report. Sergeant Gentry conducted Plaintiff's initial disciplinary hearing. (ECF No. 343-15.) The portion of the disciplinary hearing transcript Plaintiff refers to (ECF No. 343-15 at 22:21-22) does not establish that Plaintiff complained that Jenkins' report was falsified. More importantly, this does not establish that Belanger or Miranda knew about Plaintiff's complaint.

Finally, Plaintiff asserts that all prior book request forms he submitted were returned within 14 days. He submits as exhibits various publication request forms that were approved. (ECF No. 343-1 at 49-53, ECF No. 343-5 at 4, 5.)

Defendants have provided evidence consisting of the response to Plaintiff's grievance that the delay in returning the approval for his book authorization request was because it was submitted in the midst of the holidays. Plaintiff asserts that this was done in retaliation for

complaining about Jenkins falsifying her report; however, he provides no evidence to support his claim that he actually complained to Belanger and Miranda about Jenkins, or evidence to connect his purported complaint about Jenkins' to the delay in providing the approval for the book request. Plaintiff's claim that the delay was done in retaliation for complaining about Jenkins amounts to pure speculation, which is insufficient to raise a genuine dispute of material fact to defeat summary judgment. Therefore, it is recommended that Defendants' motion be granted as to this aspect of his retaliation claim in Count III.

### b. Letter from his Wife Unauthorized/Withheld for Referencing a Staff Member

There is an unauthorized mail notification form signed by Bequette, and dated February 15, 2013, stating that the mail at issue referred to an NDOC employee and was contraband. (ECF No. 337-14 at 20.)

On February 18, 2013, Plaintiff sent a kite to Belanger, stating he received the unauthorized mail notification form on February 15, 2013, and this was a violation of his and his wife's First Amendment rights. He asserted his belief that it was retaliation against him and his wife for seeking redress from the government for Jenkins' lying in a report against him. (ECF No. 337-14 at 21.)

Plaintiff filed an informal level grievance on this issue on February 24, 2013. He explained that he had asked his wife to search the internet for publicly available information about previous violations by Jenkins in connection with his disciplinary charges. (ECF No. 337-14 at 12-16.) Belanger responded to the first level grievance, stating that the letter disclosed personal information pertaining to a person other than Plaintiff, which would not reasonably be

1  part of Plaintiff's knowledge or experience and would be considered confidential. (ECF No. 337-

2  14 at 11.)

3      LeGrand responded to Plaintiff's first level grievance, stating that he had Olivas review

4  the letter, and it was determined that the letter did not contain confidential information, so Olivas

5  would give Plaintiff the letter. (ECF No. 337-14 at 6.) Plaintiff filed a second level grievance

6  indicating he sought other remedies than the letter being delivered. (ECF No. 337-14 at 3, 5.)

7  Foster responded, reiterating that the letter had been reviewed, and Plaintiff had received his

8  mail. (ECF No. 337-14 at 2.)

9      Bequette was a mailroom officer, and maintains he never destroyed Plaintiff's mail, and if

10 mail was unauthorized, the inmate would receive notice of unauthorized mail with a reason it

11 was unauthorized. (Bequette Decl., ECF No. 337-17.) Olivas' only involvement was reviewing

12 the letter at request of LeGrand, which she determined Plaintiff could have. (Olivas Decl., ECF

13 No. 337-4 at 2 ¶ 10.) Belanger's only involvement appears to be in responding to Plaintiff's first

14 level grievance.

15     Defendants have provided evidence that the piece of mail from Plaintiff's wife was

16 originally deemed unauthorized, but upon further review was authorized and it was given to

17 Plaintiff.

18     Plaintiff provides no evidence that the mail was deemed unauthorized because Plaintiff

19 complained about Jenkins. Preliminarily, Plaintiff does not provide evidence that Bequette knew

20 about Plaintiff's complaints about Jenkins. Plaintiff asserts that Jenkins used to work in the

21 mailroom and so she probably knew the mailroom workers and so the inference can be drawn

22 that Bequette and Jenkins destroyed his mail, but he provide no evidence to substantiate his

23 speculation that Jenkins knew Bequette, or, importantly, that Jenkins (or anyone else) told

1  Bequette about the complaint. In addition, Plaintiff acknowledges that the letter from his wife did
2  not mention Jenkins by name.

3      Olivas' involvement was reviewing the letter at LeGrand's request, and then deeming the
4  letter should have been authorized, and there is no evidence she retaliated against Plaintiff in
5  determining the letter should be authorized.

6      While Belanger responded to the first level grievance, there is no evidence that she was
7  involved in the determination to deem the letter unauthorized in the first place. Moreover, there
8  is no evidence that Belanger knew of the complaints about Jenkins, or that would connect the
9  first level grievance response to that knowledge.

10     Therefore, summary judgment should be granted in Defendants' favor as to this aspect of
11 the retaliation claim in Count III.

12         **c. Mail Being Delayed/Withheld between December 28, 2012 and**
13 **April 5, 2013**

14     Plaintiff sent a kite to Belanger on January 13, 2013, asking if his mail was being
15 monitored because mail from his wife in Reno had been taking a long time to get to him. He said
16 he received a "J-Pay"[8] letter dated December 30, 2013 on January 10, 2013. In addition, his wife
17 mailed a letter and pictures via the United States Postal Service (USPS) on January 7, 2013, that
18 Plaintiff had not yet received. He said that normally letters from Reno took one or two days to
19 get to him at LCC. There is a notation at the top of the kite: "mail has been taking longer to reach
20 the Lovelock Post Office." (ECF No. 337-15 at 19.)

21

22

23
_____
[8] Plaintiff explained in a later grievance that "J-Pay" refers to letters that are sent electronically
and printed at the prison for the inmate.

54

Plaintiff filed two nearly identical grievances, grievance 2006-29-63101 and grievance 2006-29-3102, on June 29, 2013, asserting that his mail had been interfered with. He claimed that until his disciplinary action based on Jenkins' false report, he had received his mail from his wife without delay or interference. He asserted that one letter from his wife was never delivered to him, and 16 others were withheld from him between four and eleven days. (ECF No. 337-16 at 11-16; ECF No. 337-15 at 10-15.)

Belanger responded to the informal level grievance, and advised Plaintiff that the mail was not being censored, blocked, or interfered with and was being handled in accordance with AR 750. (ECF No. 337-16 at 10; ECF No. 337-15 at 9.) She also acknowledged responding to him that the mail from Lovelock Post Office appeared to be slow, indicating she did not say there were delays, only that it appeared to be slow. In the first level grievance, Plaintiff reiterated his claim that the mail was being blocked and interfered with. (ECF No. 337-16 at 9; ECF No. 337-15 at 8.) LeGrand responded to the informal level grievance for grievance 2006-29-63101, stating Plaintiff had supplied no evidence to support his contention and his allegations were entirely speculative. (ECF No. 337-16 at 8; ECF No. 337-15 at 7.)

In his second level grievance, he reiterated that his mail had been timely delivered for the prior to years, but after he complained about Jenkins, one of his wife's letters was never delivered and 16 letters were withheld from him for between four and eleven days. He asserted that Jenkins previously worked in the mailroom and most likely knew the guards who interfered with his mail. (ECF No. 337-16 at 3-7; ECF No. 337-15 at 3-6.) Foster responded that Plaintiff had no evidence to support his claim, and if his mail was delayed it occurred outside of NDOC's control. (ECF No. 337-16 at 2; ECF No. 337-15 at 2.)

Defendants argue that there is no evidence of retaliatory motive. Jenkins states she never delayed Plaintiff from receiving authorized mail. (Jenkins Decl., ECF No. 337-2 at 3 ¶ 12.) Olivas states she never censored Plaintiff's mail, and she never delayed Plaintiff from receiving authorized mail or prevented him from receiving mail from family members. (ECF No. 337-4 at 2 ¶¶ 10-11.) Bequette maintains he never destroyed Plaintiff's mail, and to his knowledge all mail was delivered timely, unless it was unauthorized. Bequette also states that he was not involved in Plaintiff's disciplinary hearing and had no reason to retaliate against Plaintiff. (Bequette Decl., ECF No. 337-17.)

Plaintiff again relies on his speculation that Jenkins and Bequette must have withheld or destroyed his mail because they both worked in the mailroom at one time. This is insufficient to create a genuine dispute of material fact that either of these defendants was responsible for withholding or delaying Plaintiff's mail, let alone that it was done because of his protected activity.

Plaintiff names Keener in this claim, even though there is no allegation as to his involvement in the withholding or delay of his mail. Plaintiff asserts that on December 20, 2012, Fox attempted to serve Plaintiff with the notice of charges, but Keener ran him off so that Keener could interview him before he saw the charges. Keener then interviewed Plaintiff and Fox subsequently served him with the notice of charges, and Plaintiff told Fox that Jenkins falsified her report and Fox said, "This is prison. That's what happens." Even if these things are true, they do not demonstrate Keener had any involvement with the withholding or delay of his mail. Nor does Fox's statement establish retaliation on the part of any of the Defendants named in this claim.

1    In sum, Plaintiff has not raised a genuine dispute of material fact as to this aspect of his

2  retaliation claim. Therefore, summary judgment should be granted in Defendants' favor as to the

3  retaliation claim in Count III.

4  **D. Count IV- First Amendment Mail Tampering vs Jenkins and Bequette**

5    Plaintiff alleges that Jenkins and Bequette did not deliver all of his wife's mail to him,

6  delaying letters to each other by three to ten days on a regular basis, and destroying letters from

7  Plaintiff's wife. This allegedly occurred between December 18, 2012 to April 5, 2013.

8    Defendants argue that temporary delays of mail do not violate the First Amendment;

9  however, the malicious destruction of mail does. They contend there is no evidence of malicious

10  destruction of mail. Bequette states that all mail was delivered in a timely manner. (ECF No.

11  337-17.) Jenkins also denies the allegations. (ECF No. 337-2.)

12    Plaintiff argues that because he demonstrated that Bequette and Jenkins worked in the

13  mailroom at LCC during the relevant time period, and Bequette withheld and delayed a letter

14  because it talked about Jenkins, he is entitled to summary judgment.

15    Prisoners have "a First Amendment right to send and receive mail." *Witherow v. Paff*, 52

16  F.3d 264, 265 (9th Cir. 1995) (per curiam) (citation omitted); *see also Nordstrom v. Ryan*, 856

17  F.3d 1265, 1271 (9th Cir. 2017).

18    Defendants have provided evidence that neither Bequette nor Jenkins tampered with

19  Plaintiff's mail. (Jenkins Decl., ECF No. 337-2; Bequette Decl., ECF No. 337-17.)  It is true that

20  Bequette did deem the one letter from Plaintiff's wife as unauthorized, however, Plaintiff was

21  only deprived of the letter temporarily, until LeGrand responded to his grievance and had Olivas

22  review the letter, and Olivas determined Plaintiff should have access to the letter. Therefore, it

23  cannot be said that Plaintiff's First Amendment rights were violated. *See e.g. Crofton v. Roe*, 170

F.3d 957, 961 (9th Cir. 1999),  *as amended* May 5, 1999 (finding temporary delay in delivery of publications did not violate the First Amendment). Plaintiff presents no evidence to support his contention that Jenkins or Bequette tampered with any other mail. As such, summary judgment should be granted in Defendants' favor as to the First Amendment mail tampering claim in Count IV.

**E. Count V- "Class of One" Equal Protection vs Jenkins, Keener, Ward, Carpenter, Olivas, and LeGrand**

**1. Allegations**

Plaintiff alleges that these Defendants intentionally treated him differently than similarly situated inmates with respect to his disciplinary proceeding. He claims that other inmates charged with assault and battery would have been investigated impartially. In addition, he contends that the Defendants did not destroy evidence in other inmates' disciplinary actions, or interfere with their ability to receive books, or falsify their reports.

**2. Legal Standard**

The Fourteenth Amendment prohibits the denial of "the equal protection of the laws." U.S. Const. amend XIV § 1. "The Equal Protection Clause requires the State to treat all similarly situated people equally." *Hartmann v. Cal. Dep't of Corr.*, 707 F.3d 1114, 1123 (9th Cir. 2013) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "This does not mean, however, that all prisoners must receive identical treatment and resources." *Id*. (citations omitted); *Bruce v. Ylst,* 351 F.3d 1283, 1288 (9th Cir. 2003) (citation omitted). If the plaintiff does not assert he was discriminated against or treated differently because of his membership in a protected class, as is the case here, a plaintiff can establish a "class of one" equal protection claim by demonstrating that he "has been intentionally treated differently from others similarly

situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), *overruled on other grounds by Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008).

**3. Analysis**

Defendants assert that Breland's being returned to LCC played a role in Plaintiff being denied his request to return to LCC as they were in the same classification. They contend it is a valid penological purpose to separate inmates who teamed up in a violent assault. They further argue that they did not destroy evidence. (Keener Decl., ECF No. 337-3.) In his declaration, Carpenter states that he conducted Plaintiff's final disciplinary hearing on March 10, 2013, that was a rehearing after the warden ordered a new hearing because the first hearing recording malfunctioned. After reviewing the evidence and evaluating the witnesses and exhibits, Carpenter found Plaintiff guilty and sentenced him to 24 months in disciplinary segregation. He asserts that he never treated any inmate differently, and there is a certain amount of discretion involved. He states that he conducted a fair hearing. (Carpenter Decl., ECF No. 337-18.)

The other Defendants likewise state that they never treated Plaintiff differently than any other inmate. (Jenkins Decl., ECF No. 337-2 ¶ 11; Keener Decl., ECF No. 337-3 ¶ 10; Olivas Decl., ECF No. 337-4 ¶ 12;

Defendants also argue that under the Constitution, two persons convicted of the same offense need not receive identical sentences. They argue that Plaintiff is not entitled to the same treatment as his friend, and he cannot show he was intentionally treated differently because he cannot prove the destruction of evidence or that his hearing was different.

To support his claim that his right to equal protection was violated, Plaintiff first points to the cases *of Gadsden v. Carpenter*, Case 3:12-cv-00098-RCJ-VPC, as well as *Alexander v. Keener*, 3:12-cv-00535-MMD-VPC. In *Gadsden*, 15 inmates filed 21 grievances, and a caseworker sent a memorandum to the warden about the grievances. Plaintiff asserts that there was an investigation that led to a recommendation for a notice of charges and disciplinary hearing for abuse of the prison grievance process. Plaintiff states that there were 2 to 6 weeks of investigation and a charge that resulted in 15 days of disciplinary segregation. Plaintiff compares that to his case where there were charges that are felonies with differing accounts by witnesses, and a hearing held four days after service of the charges resulting in a sentence of two years in disciplinary segregation.

Plaintiff has not demonstrated that he is similarly situated to the inmates involved in the *Gadsden* case. He admits that *Gadsden* involved charges for filing grievances, whereas Plaintiff was charged with assault and battery. The mere fact that both inmates were subject to disciplinary charges is insufficient to state a "class of one" equal protection claim.

In the *Alexander* case, Plaintiff asserts that the inmate was placed in administrative segregation pending investigation about a prison-made weapon, which Keener investigated for over two months before charging Alexander with making shanks. At the hearing, Plaintiff claims that Alexander was allowed to review Keener's investigative report, and Alexander was allowed to call Keener as a witness. Alexander was sentenced to 180 days in disciplinary segregation. In this case, Plaintiff contends that Plaintiff asked to call Keener as a witness, and Carpenter said he would not allow it as he did not think Keener had anything relevant to this notice of charges.

Again, Plaintiff does not demonstrate that he and Alexander were similarly situated. Alexander was charged with making a prison weapon, while Plaintiff was charged with assault

1  and battery. He cannot establish an equal protection violation by asserting he was treated

2  differently than an inmate who was not similarly situated to him.

3       Plaintiff then points to inmate Breland, who was charged with the same assault and

4  battery charges stemming from the incident with Bobadilla, and was also convicted of the

5  charges and sentenced to two years in disciplinary segregation, like Plaintiff. Plaintiff and

6  Breland were transferred to ESP to complete their disciplinary segregation time on April 10,

7  2013. Breland completed his disciplinary segregation time at ESP on June 25, 2014, and was

8  transferred back to LCC protective segregation in August of 2014. Plaintiff's disciplinary

9  segregation was completed, but then, unlike Breland, he was held in administrative segregation

10 at ESP until February 11, 2015, when he was transferred to HDSP, instead of back to LCC like

11 Breland.

12      Plaintiff has demonstrated that he was similarly situated to Breland. The difference in

13 treatment that he asserts in connection with Breland is that Breland was transferred back to LCC

14 while he was not. An inmate does not have a right to be housed at any particular institution, and

15 therefore, the prison exercises discretion when it decides to transfer to an inmate to a particular

16 facility. Under these circumstances, Plaintiff cannot succeed on a "class of one" equal protection

17 claim.

18      In *Engquist v. Oregon Department of Agriculture*, the Supreme Court determined a "class

19 of one" equal protection claim was not viable in the public employment context. 553 U.S. 591

20 (2008). The Supreme Court explained:

21         There are some forms of state action, however, which by their
        nature involve discretionary decisionmaking based on a vast array

22         of subjective, individualized assessments. In such cases the rule
        that people should be 'treated alike, under like circumstances and

23         conditions' is not violated when one person is treated differently
        from others, because treating like individuals differently is an

> accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id*. at 603. The Court noted that in the public employment context, the employer "often must take into account the individual personalities and interpersonal relationships of employees in the workplace." *Id*. at 604. "The close relationship between the employer and employee, and the varied needs and interests involved in the employment context, mean that considerations such as concerns over personality conflicts that would be unreasonable grounds for 'arm's-length' government decisions (*e.g.* zoning, licensing) may well justify different treatment of a public employee." *Id*. (citation omitted). In fact, "[t]reating similarly situated individuals differently in the employment context is par for the course." *Id*. The Court went on to state that "[t]o treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Id*. at 605.

The Court was careful to point out that the Equal Protection Clause would still be implicated "when the government makes class-based decisions, treating distinct groups of individuals categorically differently" such as because of their race or gender. *Id*. (citations omitted).

Although *Engquist* was in the context of public employment, circuit and district courts have extended its rationale to other contexts where the plaintiff is challenging discretionary state action under a "class of one" theory. The Ninth Circuit addressed such a claim in *Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012). In that case, two inmates with upcoming execution dates sought a preliminary injunction against the Arizona Department of Corrections regarding its use of a lethal-injection protocol, arguing, among other things, that they were each a "class of one"

and the injection protocol allowed the prison director to treat them differently than others who were similarly situated without a rational basis. The Ninth Circuit affirmed the district court's denial of the motion for preliminary injunction, holding that the "class of one" theory "does not apply to forms of state action that 'by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.'" *Id*. at 660 (quoting *Engquist*, 553 U.S. at 603)). The court found that decisions on matters such as what drug protocol to use, who was on the execution team, and the type of equipment used for the injection were relegated to the director, and there was no state law requirement that there be uniformity. *Id*.

In *Flowers v. City of Minneapolis*, 558 F.3d 794 (8th Cir. 2009), the Eighth Circuit noted that "[a] police officer's decisions regarding whom to investigate and how to investigate are matters that necessarily involve discretion." *Id* at 799 (citation omitted). The Eighth Circuit held that "while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim." *Id*. at 799-800.

In *United States v. Moore*, 543 F.3d 891, 895 (7th Cir. 2008), the defendant appealed a conviction on the basis that the government committed a "class of one" equal protection violation because it arbitrarily singled him out for differential treatment from the defendants in a different drug-conspiracy case. The Seventh Circuit held that "an exercise of prosecutorial discretion cannot be successfully challenged merely on the ground that it is irrational or arbitrary; in the realm of prosecutorial charging decisions, only invidious discrimination is forbidden." *Id*. at 900 (citations omitted). Therefore, the Seventh Circuit concluded that *Engquist* was "equally applicable to the exercise of prosecutory discretion." *Id*. at 901. "[T]he discretion conferred to prosecutors in choosing whom and how to prosecute is flatly inconsistent with a presumption of

1  uniform treatment." *Id*.; *compare Hanes v. Zurick*, 578 F.3d 419, 4196 (7th Cir. 2009) (plaintiff

2  could state "class of one" equal protection claim against police officer when the officer is

3  motivated by malice alone).

4      In *Mazzeo v. Gibbons*, 2:08-cv-01387-RLH-PAL , 2010 WL 4384207, at *7 (D. Nev.

5  Oct. 28, 2010), *aff'd sub nom. in Mazzeo v. Young*, 510 Fed.Appx. 646 (9th Cir. 2013), District

6  Judge Hunt concluded that the plaintiff could not maintain a "class of one" claim because she

7  was improperly challenging the discretionary governmental decision-making of police

8  investigative decisions.

9      The only part of his claim for which Plaintiff has established he was treated differently

10 than someone similarly situated is his claim that he was not transferred back to LCC after he

11 served his disciplinary segregation term, while his cellmate, who was charged, convicted and

12 similarly disciplined, was moved back to LCC. As noted above, a prisoner has no right to be

13 housed in a particular facility within the prison, and the decision of where to house each inmate,

14 and what classification he is assigned, undoubtedly involves a great deal of discretion. Similar to

15 the public employment context discussed in *Engquist,* where the public employer must take into

16 account of individual personalities and interpersonal relationships, the decision of where to

17 house an inmate must take into account a myriad of factors, including, the inmate's criminal

18 history, any enemies located at the prison, the inmate's disciplinary history and whether the

19 criminal or disciplinary history involved violence, whether there are ties to gangs, the inmate's

20 custody level, the programming opportunities the inmate is eligible for and what opportunities

21 are located at each prison. As in *Engquist, "*treating like individuals differently" in this context

22 "is an accepted consequence of the discretion granted."

23

1    Moreover, if Plaintiff had presented evidence that he was similarly situated to the other

2  inmates where he claims that extensive investigations were conducted, the authorities cited

3  above demonstrate that whether and how to conduct an investigation involves considerable

4  discretion, and therefore, should not be actionable under a "class of one" equal protection theory.

5    Finally, even if Plaintiff could proceed with a "class of one" equal protection claim,

6  Defendants have produced evidence that they had a rational basis for not transferring Plaintiff

7  back to LCC: his cellmate Breland, who was also involved in the incident with Bobadilla, was

8  being transferred back to LCC. (Deal Decl., ECF No. 337-21 ¶¶ 7-9.)

9    For these reasons, Defendants' motion for summary judgment should be granted as to the

10  "class of one" equal protection claim in Count V.

11  **E. Count VIII- Retaliation vs Olivas and Deal**

12    Plaintiff alleges that Olivas was in charge of incoming transfers when Plaintiff was on the

13  list to transfer back to LCC, and when she saw his name on the list, she contacted Deal at the

14  Offender Management Division (OMD), to have Plaintiff removed from the list and kept at ESP.

15  Deal did what she asked, and they kept him in harsh conditions at ESP. He asserts that he was

16  taken off the list because he filed too many grievances.

17    Defendants argue that Plaintiff had no right to return to LCC, so they could not have

18  retaliated against him, and he was not transferred back to LCC for legitimate reasons. Plaintiff's

19  case notes indicate he had been refusing to double cell at ESP. (Deal Decl., ECF No. 337-21 ¶ 7.)

20  This would be a reason an inmate in Plaintiff's position would remain in segregation, as there are

21  generally no single bunks in general population. (*Id.* ¶ 13.) Then, in February of 2015, the

22  classification committee recommended that it was not appropriate to transfer Plaintiff back to

23  LCC due to his violent disciplinary history there. (*Id.* ¶ 8.) Plaintiff was "scratched" from his

previous reclassification approval due to the proximity to the attack, and because his co-defendant, Breland, was reclassified and returned to LCC. It was not thought to be a good idea to return them both to the same institution at that time. (*Id*. ¶ 9.) Deal does not recall ever being contacted by Olivas about removing Plaintiff's name from a transfer list, and he did not remove Plaintiff from the list. (*Id*. ¶ 14.) He was never asked to retaliate against Plaintiff. (*Id*. ¶ 15.)

Olivas also maintains that she did not "scratch" Plaintiff from the transfer list from ESP to LCC. Instead, OMD determined that the transfer was not appropriate. (Olivas Decl., ECF No. 337-4 ¶ 13.)

Plaintiff does not present evidence to substantiate his allegation that Olivas and Deal "scratched" him from the transfer list *because of* his filing of grievances.

Instead, the institutional records submitted by both Plaintiff and Defendants support Defendants' explanation of why Plaintiff was "scratched" from the LCC transfer list. The notes indicate that Plaintiff had been approved for protective segregation at LCC on March 28, 2015, was "manifested and then scratched from the manifest and P-list due to being inappropriate for LCC/PSU placement at the time." Plaintiff had been found guilty of charges for stabbing another inmate with a pencil while housed in protective segregation at LCC. He was "scratched from the manifest" after further consideration by OMD staff due to proximity of this incident and the safety and security of other inmates. It was also noted that the other inmate who participated in the incident (Breland) was approved and sent back to LCC protective segregation several months after Plaintiff "was scratched." Therefore, it was "deemed inappropriate for both inmates to be at the same institution/housing unit." Plaintiff could be considered for placement at LCC, or other classification, as eligible and appropriate. (ECF No. 337-8 at 12; ECF No. 343-14 at 34.)

1    Therefore, summary judgment should be granted in Defendants' favor as to the retaliation

2  claim in Count VIII.

3  **F. Count IX-Due Process vs Olivas and Deal**

4    Plaintiff alleges that he did not receive meaningful reviews of his administrative

5  segregation status, and was kept at ESP under harsh conditions.

6    To establish a due process claim related to placement in administrative segregation, an

7  inmate must therefore show that the classification resulted in conditions that amount to an

8  "atypical and significant hardship in relation to the ordinary incidents of prison life." *Sandin,* 515

9  U.S. at 483-84.  The "atypical and significant hardship" test is the focus of the court's inquiry,

10  "even in the face of relevant prison regulations." *See Chappell*, 706 F.3d at 1064.

11    Assuming the inmate demonstrates a protected liberty interest is implicated, the court will

12  then analyze whether the inmate received the process he was due. In the context of placement in

13  administrative segregation for non-punitive reasons, the inmate must be given notice of the

14  reason for the segregation and be provided, within a reasonable time after such placement, with

15  an informal, non-adversary review of the evidence justifying the decision to segregate the

16  inmate. *See Hewitt v. Helms,* 459 U.S. 460, 476 (1983), *abrogated in part on other grounds in*

17  *Sandin v. Connor*, 515 U.S. 472 (1995); *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir.

18  1986), *abrogated in part on other grounds in Sandin v. Connor*, 515 U.S. 472 (1995).

19    Unlike a disciplinary proceeding, an inmate is not entitled to "detailed written notice of

20  charges, representation of counsel or counsel-substitute, an opportunity to present witnesses, or a

21  written decision describing the reasons for placing the prisoner in administrative segregation."

22  *Toussaint*, 801 F.2d at 1100-01. After being placed in segregation, prison officials must

23

periodically review the initial placement. *See Hewitt*, 459 U.S. at 477 n. 9 (noting this does not necessarily require the submission of any additional evidence or statements).

Defendants contend that Plaintiff's records demonstrate that he received regular segregation reviews following his discipline, and he had no right to be housed at a particular institution.

Assuming, without deciding, that Plaintiff has an implicated liberty interest based on his conditions of confinement in administrative segregation at ESP, the court finds that he received all the process he was due.

Plaintiff completed his disciplinary sanction on October 25, 2013, at ESP, and then was placed in administrative segregation. There is a notation on December 16, 2013, indicating Plaintiff declined to appear for his review, with Plaintiff stating he did not want to double cell. (ECF No. 337-8 at 9; ECF No. 343-14 at 31.) He had another on February 25, 2014, where he was seen at his cell door. He was noted as being a "LCC/PS failure" and as "refus[ing] to participate in the double cell process." (*Id*.) On March 17, 2014, it was noted that he could be considered for transfer back to LCC. At that point, he said he was willing to double cell at ESP "with like inmate." (*Id*.) Plaintiff was seen on March 26, 2014, to review for transfer to LCC in protective segregation. It noted that he completed his disciplinary sanction on October 25, 2013, and he was previously not able to transfer back to LCC because the victim (Bobadilla) was still there, but Bobadilla had now been discharged. The committee recommended transfer to LCC in protective segregation. Plaintiff was subsequently approved for close custody, protective segregation at LCC. (ECF No. 337-8 at 10; ECF No. 343-14 at 32.)

He had monthly administrative segregation reviews between August and November of 2014, and it was noted he was still housed there because he was "LCC PS failure" and refused to

double cell. (*Id.*) On December 29, 2014, he refused to be seen at his door. A full classification

committee was recommended at a later date for possible placement at HDSP in protective

segregation. (ECF No. 337-8 at 11; ECF No. 334-14 at 33.) Plaintiff was seen in the office on

January 28, 2015, he was noted as being in administrative segregation because he refused to

double cell and was "LCC PS failure." A full classification committee was recommended again

for possible placement at HDSP in protective segregation. (*Id.*)

Plaintiff had a full classification review on February 2, 2015, to determine where he

could transfer. The committee agreed to recommend transfer to HDSP in protective segregation,

but Plaintiff stated that is where his case originated and he would have issues housing there. No

action was taken at that time, and his case was to be "staff[ed]" with Warden baker and OMD.

(*Id.*)

The committee met and agreed to transfer him to close custody, protective segregation at

HDSP. They felt Plaintiff was not appropriate to transfer back to LCC protective segregation

because of his violent disciplinary history there. He also was noted as having a violent history

before incarceration. The note was updated on February 9, 2015, stating Plaintiff was approved

for close custody, protective segregation at HDSP. (ECF No. 337-8 at 12; ECF No. 343-14 at

34.)

Plaintiff was received at HDSP on February 11, 2015. (*Id.*)

Plaintiff's monthly administrative segregation classification results notices from

November 2013 through January of 2015 state that the request to be classified from

administrative segregation to general population were deferred for 30 days because Plaintiff

refused to double cell at ESP. (ECF No. 337-10 at 3-16; ECF No. 343-13 at 15-28.)

Plaintiff was kept in administrative segregation at ESP following his early release from disciplinary segregation in October of 2013, until he was transferred to HDSP in February of 2015, or a period of roughly a year and four months. During that time, he received monthly administrative segregation reviews, as well as several full classification hearings. Plaintiff disputes he refused to double cell, but does not dispute that he did receive monthly reviews. While he *alleges* that these reviews were not "meaningful," he presents no argument as to how they were not meaningful. His affidavit focuses solely on the incident with Bobadilla, and contains no statements concerning his administrative segregation placement or reviews.

Therefore, summary judgment should be granted in favor of Deal and Olivas as to the due process claim in Count IX.

**G. Count X- Conspiracy to Retaliate vs Olivas and Deal**

Plaintiff alleges that Olivas and Deal prevented him from being transferred to LCC, and this was done in a conspiracy to retaliate against him for filing grievances.

Plaintiff has not demonstrated a causal connection between his protected activity and the decision that he remain at ESP; therefore, he cannot prevail on his conspiracy claim. Therefore, summary judgment should be granted in Deal's and Olivas' favor as to Count X.

**H. Count VI - Conspiracy vs Jenkins, Vallaster, Whiting, Olivas, Keener, Carpenter, Ward, LeGrand, Belanger, Miranda and Bequette**

Plaintiff alleges that the violation of his rights was part of a conspiracy to protect fellow guards and the administration from being held accountable and to chill Plaintiff's right to grieve the wrongful actions of these employees. He avers that they conspired to deprive him of his due process rights to meaningful administrative segregation hearings, and to be treated the same as similarly situated inmates, and to keep him in solitary confinement under harsh conditions.

The elements of a conspiracy claim brought under section 1983 are: (1) an agreement or meeting of the minds to violate constitutional rights; and (2) an actual deprivation of those rights resulting from the alleged conspiracy. *Franklin v. Fox,* 312 F.3d 423, 441 (9th Cir. 2002); *see also Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Franklin*, 312 F.3d at 441 (internal quotation marks and citation omitted).

The court has concluded that summary judgment should be granted in Defendants' favor as to each of the federal constitutional claims asserted against them. Therefore, Plaintiff cannot maintain a conspiracy claim against these Defendants, and summary judgment should be granted in Defendants' favor as to the conspiracy claim in Count VI.

**I. XII-State Law Deprivation of Property Claim under NRS 41.031 and 41.0322 vs Cartier, Belanger, LeGrand, Schardin, Gilder, and the State of Nevada on relation of NDOC**

Defendants' motion contains no argument concerning this claim, and Plaintiff does not move for summary judgment as to this claim.

**J. Count XIV-Intentional Infliction of Emotional Distress vs Jenkins, Vallaster, Whiting, Olivas, Keener, Ward, LeGrand, Carpenter, Belanger, Miranda, Olivas, Bequette, and Deal**

Plaintiff alleges that the Defendants committed illegal acts for the purpose of intentionally inflicting emotional distress on Plaintiff, and he suffered from upset bowels, hypertension, headaches, back pain, and heartburn, a painful rash and heightened cortisol.

A plaintiff asserting an intentional infliction of emotional distress claim in Nevada must demonstrate: "(1) extreme and outrageous conduct with either the intention of, or reckless

disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme

emotional distress and (3) actual or proximate causation." *Star v. Rabello*, 625 P.2d 90, 92-93, 97

Nev. 124, 125 (1981) (citation omitted).

"[E]xtreme and outrageous conduct is that which is outside all possible bounds of

decency and is regarded as utterly intolerable in a civilized community. *Maduike v. Agency Rent-*

*A-Car*, 953 P.2d 24, 26, 114 Nev. 1, 4 (1998) (citation and quotation marks omitted). "[P]ersons

must necessarily be expected and required to be hardened … to occasional acts that are definitely

inconsiderate and unkind." *Id*. (citation and quotation marks omitted).

Defendants argue that Plaintiff has no admissible evidence that Defendants engaged in

extreme or outrageous conduct, and has not shown his alleged damages. In addition, his medical

records do not support his allegation. (ECF No. 339-1.) Finally, he did not allege specific

conduct as to each Defendant.

Plaintiff states that his notes, medical records and facts show the actions of Defendants

caused him physical injury and emotional distress inflicted.

To this point, Plaintiff has not raised a genuine dispute of material fact to demonstrate

that the defendants actually engaged in any conduct that could potentially be considered as

"extreme and outrageous." Moreover, the court agrees with Defendants that Plaintiff has not

adequately demonstrated what conduct each Defendant named in this claim engaged in that

*proximately caused* his asserted emotional distress. There is no evidence before the court to

connect any asserted medical malady with the conduct of a defendant named in this claim.

Therefore, summary judgment should be granted in Defendants' favor as to the IIED claim in

Count XIV.

**K. Count XV-Assault and Battery vs Bobadilla**

Plaintiff moves for summary judgment as to the State tort assault and battery claims against Bobadilla in Count XV.

A plaintiff asserting a tort claim for assault must show the defendant: (1) intended to cause harmful or offensive physical contact, and (2) the plaintiff was put in apprehension of such contact. Restatement (Second) of Torts, § 21 (1965). To establish a claim for the tort of battery, the plaintiff must establish that the defendant (1) intended to cause harmful or offensive contact, and (2) such contact did occur. *Id.* §§ 13, 18; *accord Burns v. Mayer*, 175 F.Supp.2d 1259, 1269 (D. Nev. 2001) (citing the same); *Switzer v. Rivera,* 174 F.Supp.2d 1097, 1109 (D. Nev. 2011).

According to Plaintiff, on December 18, 2012, Bobadilla attacked Plaintiff in the dining hall. He relies on his own affidavit, which states that on that date, he was seated at a table in the dining hall at LCC, eating dinner with inmates Breland and Dawson, when "without warning or provocation," Bobadilla walked up to him and punched him in the face and head. (Pl. Aff. ECF No. 343-27 at 5 ¶¶ 3-4.) According to Plaintiff, when this occurred, he was stunned and unable to immediately respond. (*Id.* ¶ 5.) Then, Breland got up from his seat and grabbed Bobadilla to subdue him and stop the attack. (*Id.* ¶ 6.) Plaintiff maintains that he did not stab or attempt to stab Bobadilla. (*Id.* ¶ 7.) He also cites the affidavit of inmate Breland, who corroborates Plaintiff's version of events. (Breland Aff., ECF No. 343-27 at 7.) He also contends that he had visible injuries to his face after the fact. (ECF No. 343-13 at 4-5 (photos of Plaintiff); ECF No. 343-13 at 6.) He relies on the medical report of incident, injury or unusual occurrence from December 18, 2012. Plaintiff denied acute distress. He had mild periorbital swelling at the right orbit, a superficial scratch on the lateral right orbit, mild swelling of the left cheek, and a

1   superficial scratch on the left side of the neck. There were no signs of traumatic injury. He was to
2   be returned to custody.

3       Plaintiff also claims that Whiting confirmed that Bobadilla punched Plaintiff; however,
4   Whiting testified that he did not see the fight start, but when he looked up he "just saw them both
5   together punching." (ECF No. 343-15 at 26:2-4.)

6       Plaintiff also asserts that Bobadilla told medical that he fought with Plaintiff. He relies on
7   Bobadilla's medical report of incident, injury or unusual occurrence from that date.
8   (ECF No. 343-13 at 9.) The report states that Bobadilla told medical staff there was a verbal
9   argument on "nacho night" and then on December 18, 2012, when he was walking to get his tray,
10  another inmate lunged at him with an object, which he blocked, and then "the fight was on."
11  Bobadilla noted he was hit multiple times. (*Id*.) He had right eye bruising that was purple in
12  color; a bruise on the right side of his jaw; left knee purple bruising; right upper forearm purple
13  bruising; and a softball-sized bruise on the right shoulder blade area. (*Id*.)

14      Plaintiff claims that Bobadilla planned this attack. To support this position, he refers to
15  the affidavit of inmate James Gisi, who claims that Bobadilla asked who Plaintiff was prior to
16  the incident, and then said he was "going to smash someone out." (Gisi Aff., ECF No. 343-27 at
17  2-4.) Plaintiff also relies on the affidavit of Nicholas Neal. Neal was living in Unit 3 and asserts
18  that "various Hispanic inmates" were talking about how they were going to attack Plaintiff that
19  night at dinner (though Neal does not identify Bobadilla as being one of those inmates). (Neal
20  Aff., ECF No. 343-27 at 10-11.)

21      Defendants have opposed Plaintiffs request for summary judgment as to the assault and
22  battery State tort claims against Bobadilla. They contend that it is not undisputed that Bobadilla
23  attacked Plaintiff, as alleged. Jenkins testified that Plaintiff approached Bobadilla and took a

1    swing at him. In addition, Bobadilla's motion to dismiss also disputes Plaintiff's version of

2    events.

3            Plaintiff had moved to strike this portion of Defendants' argument (ECF No. 358), which

4    the court denied (ECF No. 360). Plaintiff argued that the Defendants should not be allowed to

5    assert arguments on behalf of Bobadilla, whom the Attorney General's Office does not represent.

6    In denying the motion to strike, the court noted that "[w]hile it is somewhat unique that one

7    defendant may assert arguments on behalf of another party they do not represent, there may be

8    tactical reasons why one defendant may want to advocate on behalf of another defendant."

9    (ECF No. 360.)

10           The court also notes that a failure of an opposing party to file points and authorities in

11   response to a motion for summary judgment does not constitute consent to the granting of the

12   motion, as it does in the case of other motions. *See* LR 7-2(d). Therefore, the court must

13   determine whether on the record before it, there exists a genuine dispute of material fact.

14           Defendants are correct that there is evidence before the court, both in connection with the

15   pending dispositive motions, as well as in Bobadilla's previously filed motion to dismiss, that

16   creates a genuine dispute of material fact as to Plaintiff's State tort assault and battery claims

17   against Bobadilla.

18           Jenkins testified in the hearing that Bobadilla walked by Plaintiff while seated, and

19   Plaintiff stood up and that is when the fight occurred. (ECF No. 343-16 at 34:18-25, 35:1-4.)

20   Bobadilla's medical report, which Plaintiff relies on, also reflects that Bobadilla was injured in

21   the altercation, and demonstrates Bobadilla's position that it was the other inmate lunging at him

22   with an object that initiated the altercation. (ECF No. 343-13 at 9.)

23

In Bobadilla's own motion to dismiss[9], Bobadilla maintained that he was attacked while he was a porter cleaning tables in the dining hall. He states that he went to wipe the table and Plaintiff lunged at him with an object to his chest, which Bobadilla blocked with his dinner tray. (ECF No. 226 at 3.)

Since there remains a genuine dispute of material fact as to what occurred between Plaintiff and Bobadilla on December 18, 2012, Plaintiff's motion for partial summary judgment should be denied as to the State tort assault and battery claims against Bobadilla in Count XV.

**L. Remaining State Law Claims**

If this Report and Recommendation is adopted and accepted, the claims that remain in this action are: the State law deprivation of property claims in Count XII against Cartier, Belanger, LeGrand, Schardin, Gilder, and the State of Nevada on relation of NDOC, and the State law tort assault and battery claims against Bobadilla in Count XV.

A district court has discretion over whether to exercise supplemental jurisdiction over state law claims arising from the same set of operative facts that support a federal claim. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639-40 (2009) (citing 28 U.S.C. § 1367(a), (c)). Ordinarily, when a district court dismisses "all claims independently qualifying for the exercise of federal jurisdiction," it will dismiss all related state claims as well. *Artis v. District of Columbia*, 138 S.Ct. 594, 598 (2018) (citing 28 U.S.C. § 1367(c)).[10] Since the court is

---

[9] Bobadilla signed his motion under declaration of penalty of perjury. (ECF No. 226 at 5.) Bobadilla's motion was converted to a motion for summary judgment because it relied on evidence outside of the pleadings, and was denied because there was a genuine dispute of material fact as to what occurred on December 18, 2012. (ECF Nos. 325, 346.)

[10] It should be noted that "[t]he period of limitations for any [state] claim [joined with a claim within federal-court competence] shall be tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d). The Supreme Court held that "tolled" means "to hold it in abeyance, *i.e.*, to stop the clock." *Artis*, 138 S.Ct. at 598.

recommending that summary judgment be granted in Defendants' favor as to all of the federal claims, it is recommended that the District Judge decline to exercise supplemental jurisdiction over the remaining state law claims.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **STRIKING** Plaintiff's cross-motion for summary judgment (ECF No. 355) as untimely;

(2) **DISMISSING** the Doe defendants without prejudice for failure to timely substitute them in as parties;

(3) **GRANTING** Defendants' motion for summary judgment (ECF No. 337);

(4) **DENYING** Plaintiff's motion for partial summary judgment (ECF No. 343); and

(5) **DECLINING** to exercise supplemental jurisdiction over the remaining State law deprivation of property claims in Count XII and the assault and battery claims in Count XV.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

///
///
///
///
///

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: March 3, 2021

_____
William G. Cobb
United States Magistrate Judge